**Alisubel CARBALLO on Behalf of Heriaberto CORTES, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

No. 98 Civ. 0163(RWS).

United States District Court, S.D. New York.

Feb. 4, 1999.

**210**

James M. Baker, New York City, NY, for plaintiff.

Honorable Mary Jo White, United States Attorney for the Southern District of New York, New York City, NY by Lorraine S. Novinski, Assistant U.S. Attorney, of counsel, for defendant.

*OPINION*

SWEET, District Judge.

In this action brought by plaintiff Alisubel Carballo on behalf of her minor child, Heriaberto Cortes ("Heriaberto"), pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision by defendant Kenneth S. Apfel, Commissioner of the Social Security Administration (the "Commissioner"), denying the application of Carballo's child for Supplemental Security Income ("SSI") benefits based on disability, both Carballo and the Commissioner have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Carballo has also moved for remand based on the existence of new evidence. For the reasons set forth below, Carballo's motion is granted, the Commissioner's is denied, and the case is remanded to the Commissioner for further proceedings in accordance with this opinion.

*Prior Proceedings*

On May 8, 1995, Carballo submitted an application for SSI benefits on behalf of Heriaberto. Following a denial of her application both in the initial proceeding and on reconsideration, Carballo requested a hearing before an Administrative Law Judge (the "ALJ").

The hearing before the ALJ was held on July 3, 1996. Carballo and Heriaberto appeared at the hearing and testified without the assistance of legal counsel and with the assistance of an interpreter. On July 26, 1996, the ALJ issued a decision finding that Heriaberto was not disabled at any time through the date of the ALJ's decision and denied his application for benefits. On August 22, 1997, the Appeals Council denied Carballo's request for review, and the ALJ's decision became the final decision of the Commissioner.

Carballo filed the complaint in this action on January 12, 1998, and an amended complaint on February 10, 1998. The instant motions were filed by the Commissioner and Carballo on September 10, 1998, and November 2, 1998, respectively. Oral arguments were held on November 18, 1998, at which time the motions were deemed fully submitted.

*Facts*

Heriaberto was born on January 5, 1987. He was eight years old when his SSI application was filed. Carballo alleges that he has been disabled by a learning disability since April 9, 1994.

The administrative record in this case consists of various Social Security Administration ("SSA") forms and notices, the testimony of Carballo and Heriaberto at the July 6, 1996, hearing before the ALJ, and school and academic records relating to Heriaberto's impairments. There is also a report of a consultive examination prepared by a consulting psychologist retained by the Commissioner.

## I. *Testimony*

At the hearing, Carballo testified that Heriaberto was nine years old and lived with herself and a seven year old brother. He had no physical health problems. In school, Heriaberto was in special education and Carballo had recently been told that he would not be promoted at the end of the year. She described Heriaberto as unable to read.

Carballo appeared most concerned about problems Heriaberto had with retention and memory. She stated that he did not retain information and would forget a new word half an hour after learning it. Heriaberto could not remember the names of his cousins in Puerto Rico with whom he had been raised. He did not know the names of his grown older siblings.

Carballo also mentioned Heriaberto's difficulties with speech and talked about some apparent emotional problems. She reported that Heriaberto had speech and language problems, including a limited vocabulary and communication skills, and that he needed her assistance in dressing and washing.

Following Carballo's testimony, the ALJ asked Heriaberto a series of questions about his family life, school experiences, and daily activities. The transcript reflects that Heriaberto's responses were inaudible more than half of the time, and otherwise generally monosyllabic or nonexistent. In response to a question by the ALJ, Carballo explained that Heriaberto had always had speech difficulties similar to those he displayed at the hearing.

## II. *Records Relevant to Cognitive Impairment*

Various school records confirm that Heriaberto's intellectual capacity is limited. On January 4, 1995, Heriaberto was examined by a psychologist, Lourdes Rodriguez ("Rodriguez"). This examination was conducted at the request of Carballo because of her concern about Heriaberto's lack of academic progress. Heriaberto was quiet and did not speak readily. He had difficulty expressing himself orally, and these problems affected his performance throughout the assessment. Testing performed by Rodriguez described

Heriaberto as having a verbal IQ in the borderline range, a performance IQ in the average range, and a full scale IQ in the low average range. Heriaberto did worst on subtests for fund of general information and short-term auditory memory where his scores were "deficient." These difficulties were viewed as likely to "interfere with the acquisition of basic academic skills." (Tr. at 120.)

The 23 point spread between his verbal and performance scores was described as significant and indicative of a learning disability. SSA's consulting psychologist, Dr. Margaret Chu ("Chu"), likewise viewed Heriaberto's intellectual functioning as "borderline." (Tr. at 134.)

Tests of perceptual-motor performance revealed a visual-motor age somewhat above Heriaberto's chronological age, and his short-term visual memory was said to be adequate. Heriaberto's social functioning was said to be affected by his communication difficulties.

Other school records indicate that Heriaberto's learning disability has essentially prevented him from acquiring any of the skills involved in reading and writing. On January 8, 1995, three days after his eighth birthday, Heriaberto underwent a bilingual education evaluation by Rafael Padilla ("Padilla") He was then in the second grade and the middle of his third year of public schooling. Padilla noted that Heriaberto had a limited attention span and was easily distracted. Pursuant to the evaluation, the most dramatic results were in reading and writing. When tested in Spanish, he consistently performed at the "readiness,"—*i.e.,* beginning kindergarten—level. In English, Heriaberto was unable to register any meaningful test scores:

> [O]verall reading skills are on a Readiness grade level in Spanish and unable in English. His ability to read vocabulary letters and words in [sic] were scored on a Below Pre-primer (Readiness) grade level range in Spanish, and unable to read or respond in English.... His *Oral reading* comprehension [scores] were low and delayed and in great delays and deficits.... He is in the process of learning letter/sound relations, has not learned any word attack or phonetic skills needed to

decode words.... In *Spelling* skills subtest, he scored on a Readiness grade range level in Spanish. He has not learned word attack, phonic skills therefore was unable to do encoding or decoding learned words from their sounds. (Tr. at 125–26.) In another document, Heriaberto is described as using his fingers to read letters, not words and as unable to write the alphabet.

With respect to mathematics, Heriaberto's overall scores were at the K.3, *i.e.*, third month of kindergarten, level. The evaluation concluded that Heriaberto was "functioning below age expectancy in all his academic subjects." (Tr. at 129.) The evaluator, however, cautioned that these results must be interpreted with caution because of the absence of any local norms or any standardized procedures for testing bilingual children.

Heriaberto's poor academic performance is reflected at many other places in the record. The school psychologist, Rodriguez, whose report is discussed above, noted that Heriaberto, at age eight, had difficulty expressing his thoughts, was unable to read or write, and did not even know the letters of the alphabet. Following the testing in January 1995, the New York City Public Schools classified Heriaberto as learning disabled and recommended full-time special education to address his "significant academic delays." (Tr. at 100–03.) Heriaberto was put in a special class with bilingual instructional services and speech and language therapy.

At the end of the 1994–1995 school year, Heriaberto's second grade teacher described his overall performance as "very poor." (Tr. at 92.) At the end of the following year, his third grade teacher noted that he had made progress in math but still "has difficulty recognizing letters, simple sounds and words, and remembering recently covered material." (Tr. at 149.) Yet another teacher, reporting near the end of the 1996–1997 school year, when Heriaberto was in the third grade for the second time, described him as a "slow learner." (Tr. at 159.)

## III. *Records Relevant to Communicative Impairment*

In 1994 and 1995, Heriaberto also received extensive formal and informal assessments of his expressive and receptive language skills. A bilingual speech-language evaluation was conducted on February 23, 1995. At that time, Heriaberto was in a bilingual general education classroom. He had little or no English language comprehension or expression. His receptive language skills in Spanish were approximately two and one-half years delayed, putting these skills somewhat under two-thirds of age expectancy.[1] Expressive Spanish language skills were better, ranging from one and one-half years delayed to two years delayed. The examiner characterized these delays as "mild to moderate" for the expressive category and "moderate" for the receptive category. (Tr. at 132.)

Apart from formal test results, the administrative record contains various other indications of Heriaberto's communication problems. An informal language assessment conduction in connection with his March 1995 Individualized Education Program described his expressive and receptive language skills as "poor." (Tr. at 106, 124–25.) Heriaberto had poor syntax and fluency, poor articulation, and was described as engaging in limited conversation with short and simple incomplete sentences. He also had what were described as language processing difficulties. Rodriguez, the school psychologist, noted that Heriaberto had difficulty expressing his thoughts, used words incorrectly, and had word retrieval problems. Rodriguez felt Heriaberto's communication problems were evident throughout the assessment and affected his performance. Rodriguez was concerned that they were also affecting his social adjustment with peers.

Teacher comments echoed these assessments. The second grade teacher, Ana Maria Vasquez ("Vasquez"), noted speech problems, especially in English. The third grade

1. On the Preschool Language Scale–3 (PLS–3) in Spanish, Heriaberto at the age of eight years and one month (97 months) demonstrated a language age of five years and four months (64 months) or 66% of age expectancy. On another test of receptive language ability, his language age was only four years and five months or 55% of age expectancy.

teacher, Steven Cruz ("Cruz"), also remarked that Heriaberto had difficulty expressing himself. The third grade teacher in the next school year, again Vasquez, reported that he did not use age-appropriate vocabulary.

## IV. *Records Relevant to Concentration, Persistence, and Pace*

The administrative record additionally contains a number of references to difficulties Heriaberto experienced in the area of concentration, persistence, and pace.

In a form submitted to the SSA shortly prior to the hearing before the ALJ, Carballo stated that Heriaberto was "immature" and "easily distracted." "He frequently day dreams and has difficulty staying on task. He is inattentive during class instruction." (Tr. at 87.)

Padilla, the education evaluator, described Heriaberto's behavior in the testing situation as follows:

Heriaberto Cortez ... presented as a student who has poor and limited attention and retention span and [is] easily distracted. Heriaberto is a boy who needs constant approval, praise, support, and constant repetition.... He has a tendency to loose [sic] focus and concentration of what was explained or asked....

. . .

... [A]t times questions had to be repeated, has poor and limited retention, poor concentration and attention span, is very easily distracted.... [H]e needs lots of encouragement, praise, clarifications and support.

(Tr. at 124–25.)

Chu, SSA's consulting psychologist, seconded these views:

Patient is not very cooperative. He is concentrating on playing with his toy, he seems to be distracted and not participating in the interview.... [He is] oblivious to the environment. His intelligence is estimated to be borderline. Patient's attention and concentration are poor in relating to interview and surroundings. He is able to concentrate in his toys and playing.

(Tr. at 134.) Chu's diagnostic impressions included communication disorder, not otherwise specified, learning disability, and "rule out attention deficit disorder." (Tr. at 135.)

The teacher reports confirm that these behaviors occurred regularly in the classroom setting. Heriaberto's second grade teacher described him as never completing work and as "always daydreaming in the classroom." (Tr. at 91.) In the 1995–1996 school year, his third grade bilingual special education teacher, Cruz, stated:

[He] displays marked difficulty paying attention and has difficulties learning new skills.... Child must be prompted nearly constantly to remain on task. Is prone to staring blankly ahead.... His tendency to become unfocused and day dream severely hinders his ability to progress.

(Tr. at 151–52.) Heriaberto's second grade teacher echoed her predecessor's comments two years earlier that Heriaberto spent his time daydreaming and did not complete work on time, if at all.

## V. *Records Relevant to Personal/Behavioral Function*

There are references in the record to problems in the area of personal/behavioral function. Carballo, on the form mentioned above, stated that Heriaberto needed or wanted her assistance for bathing, washing, dressing, and tying his shoes. Heriaberto's second grade teacher reported that he refused to do self-care activities, such as going to the toilet, washing, and dressing. His third grade teacher reported that he displayed age-inappropriate/immature behavior on a semi-regular basis, such as playing with juvenile toys and crying for no reason. Finally, the SSA's consulting psychologist, relating behaviors described to her by Carballo, noted that Heriaberto acted immaturely and younger than his age, and required assistance with bathing and dressing. She felt that these behaviors warranted complete psychological testing and individual psychotherapy.

### *Discussion*

#### I. *Rule 12(c)*

In deciding a motion for judgment on the pleadings, the court is generally limited to

considering the factual allegations set forth in the complaint and corresponding answer. *See* Fed.R.Civ.P. 12(c). A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law. *See Juster Assocs. v. Rutland*, 901 F.2d 266 (2d Cir.1990); *Adames v. Chater*, No. 95 Civ. 9384, 1996 WL 306549 (S.D.N.Y.1996); *DeSantis v. United States*, 783 F.Supp. 165 (S.D.N.Y. 1992).

## II. The Scope of Judicial Review/Standard of Review.

■ The Social Security Act, 42 U.S.C. § 301 *et seq.*, provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing a denial of disability benefits, a court may reverse a finding of the Commissioner only if that finding is not supported by substantial evidence in the record. *See id.* (made applicable to SSI cases by 42 U.S.C. § 1383(c)(3)). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir.1995); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). The substantial evidence test, moreover, applies not only to the Commissioner's findings of fact, but also to the inferences and conclusions of law to be drawn from such facts. *See Rosado v. Shalala*, 868 F.Supp. 471, 473 (E.D.N.Y.1994); *Rodriguez v. Califano*, 431 F.Supp. 421, 423 (S.D.N.Y.1977); *see also Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir.1966).

■ This Court is not empowered to make a *de novo* determination of whether Heriaberto is disabled. *See Wagner v. Secretary of Health and Human Servs.*, 906 F.2d 856, 860 (2d Cir.1990); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984). Rather, the Court's function is limited to assessing whether the ALJ applied the proper legal standards in making his determination and whether that determination is supported by the substantial evidence on the record as a whole. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987); *Donato v. Secretary*, 721 F.2d 414, 418 (2d Cir.1983). As the Second Circuit has explained, " 'the court may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a de novo review.' " *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

■ When a claimant is unrepresented at the administrative hearing, as was the case here, the ALJ is under a heightened duty " 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.' " *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir.1990) (quoting *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir.1982) (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir.1980))); *see Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). After all, as the Second Circuit has noted, the application of the burden of proof is " 'particularly elusive in cases involving social security benefits,' in part because the proceedings 'are not designed to be adversarial' and certainly are not likely to be such when the claimant, as here, is unrepresented." *Donato*, 721 F.2d at 418 (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir.1982)); *see Almonte v. Apfel*, No. 96 Civ. 1119, 1998 WL 150996, at *6 (S.D.N.Y. Mar. 31, 1998).

## III. Legal Framework for Determining Childhood Disability
### A. Law in Effect at the Time of the ALJ's Decision

Under the standard in effect for assessing a childhood disability at the time of the ALJ's decision in this case, a child under the age of eighteen would be entitled to benefits if he suffered from a "medically determinable physical or mental impairment of comparable severity" to one that would disable an adult. 42 U.S.C. § 1382c(a)(3)(A) (1994); *see also Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir.1997). The applicable regulations de-

fined a disability of "comparable severity" as one that "so limits [a child's] ability to function independently, appropriately, and effectively in an age-appropriate manner" that the resulting impairments and limitations "are comparable with those which would disable an adult." 20 C.F.R. 416.924(a) (1996); *see also Quinones*, 117 F.3d at 33.

In determining whether a child's impairment is of "comparable severity," the ALJ followed a four-step procedure. *See* 20 C.F.R. § 416.924(b); *see also Quinones*, 117 F.3d at 34; *Almonte*, 1998 WL 150996, at *1. First, the ALJ would consider whether the child was engaged in a "substantial gainful activity." 20 C.F.R. § 416.924(b). If the child was not engaged in such an activity, then the ALJ would determine whether the child had an impairment or combination of impairments that were "severe." *Id.* An impairment is said to be severe if it imposes more than a minor limitation on the child's ability to function in an age-appropriate manner. *See id.* § 416.924(d). If severity was not found to exist, the ALJ would find that the child was not disabled. However, if the child's impairment was severe, as found in this case, the ALJ would consider whether the impairment "meets or equals in severity," any impairment listed in 20 C.F.R. part 404, subpart P, appendix 1. *Id.* Finding that the child had a "listed" impairment meeting the durational requirements resulted in a finding of disability. *See id.* § 416.924(e).

If the child's impairment was not "listed," but was nonetheless "severe," the ALJ would proceed to a fourth step and conduct an "individualized functional assessment" ("IFA") of the child so as to determine whether the impairment at issue would disable an adult. *See id.* § 416.924(b) & (f). In essence, the ALJ would conduct an IFA and consider it together with all other relevant evidence to determine whether the child had the overall ability to function independently, appropriately, and effectively in an age-appropriate manner.

The IFA focused on the child's functioning in various age-appropriate activities, including developmental milestones, activities of daily living, and developmental and functional domains. *See id.* § 416.924b. The regula-

tions provided that in conducting an IFA for a child of Heriaberto's age—for children between the ages of six and twelve—the ALJ was to consider the effects of the impairment with respect to six "domains of development or functioning": (1) cognition, (2) communication, (3) motor abilities, (4) social abilities, (5) personal/behavioral patterns; and (6) concentration, persistence, and pace in task completion. *See id.* § 416.924d(c) & (h); *see also Quinones*, 117 F.3d at 34; *Almonte*, 1998 WL 150996, at *1.

As a guideline, the ALJ would "generally find comparable severity" if the IFA showed that the child is impaired to a marked degree in one domain and to a moderate degree in at least one other domain, or if the child is impaired to a moderate degree in at least three of the six domains. *See* 20 C.F.R. § 416.924e(c)(2)(i) & (ii). As stated by the Second Circuit in *Quinones*, however, "these regulations also make clear that '[e]ach case must be evaluated on its own merits using the principles and guidelines of all the regulations addressing childhood disability.'" *Quinones*, 117 F.3d at 34 (quoting 20 C.F.R. § 416.924e(c)(2)).

The regulations suggest that a "marked" impairment is one that is more than moderate but less than extreme. It may arise when several activities or functions are impaired, or even when only one is impaired, "as long as any degree of limitation is such as to interfere seriously with the ability to function (based on age-appropriate expectations) independently, appropriately, and effectively, on a sustained basis." *Tracy v. Apfel*, No. 97–C–4357, 1998 WL 765137, at *3 (E.D.N.Y. Apr. 22, 1998); *see* 20 C.F.R. § 416.924e(c)(2). A "moderate" impairment is one in which the degree of limitation is more than mild but less than marked. *See id.*

As explained by the regulations, in making a determination of childhood disability, the ALJ would be required to consider "all relevant evidence" which may, in a given case, include "medical evidence, school records, information from people who know [the child] and can provide information about [the child's] functioning—such as [the child's] parents, care givers, and teachers—and other

evidence that can help [to] assess [the child's] functional on a longitudinal basis." 20 C.F.R. § 416.924(g) (1995); *see Almonte,* 1998 WL 150996, at *2.

## B. *The Personal Responsibility and Work Opportunity Reconciliation Act*

On August 22, 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") of 1996, Pub.L. 104–193, 110 Stat. 2105, which amended 42 U.S.C. § 1382c(a)(3) and altered both the statutory definition of childhood disability and the framework for determining such a disability. Under the new law, a child under the age of eighteen is considered disabled for purposes of SSI benefits if "that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to ·last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i) (1997).

This disability standard no longer compares the impairment to that which would disable an adult. The "comparable severity" standard has been repealed. "The new law also directs the Commissioner to eliminate the individual functional assessment set forth in regulations at 20 C.F.R. § 416.924d and 416.924e." *Scullark v. Apfel,* No. 97 Civ. 7138, 1998 WL 472059, at *6 (S.D.N.Y. Aug.6, 1998); *see* 110 Stat. 2105 § 211(b)(2).

The regulations implementing the new standard provide for a three-step process for a child seeking benefits. These steps are essentially identical to the first three steps of the four-step analysis required by the prior regulations. First, as under the prior standard, the ALJ must determine whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b) (1998). If this child is not, then the analysis proceeds to step two. If he is, then a finding of disability is precluded. *See id.* § 416.924(a). Step two requires the ALJ, as before, to determine whether the child's impairment or combination of impairments is severe. *See id.* 416.924(c). The child will not be found to have a severe impairment if it constitutes a "slight abnormality or a combination of slight abnormalities that causes no more than mini-

mal functional limitations." *Id.* If, however, there is a finding of severe impairment, the analysis proceeds to the final step, which requires the ALJ to determine whether the

> impairment(s) ... meet, medically equal, or functionally equal in severity a listed impairment in appendix 1. An impairment(s) causes marked and severe functional limitations if it meets or medically equals in severity the set of criteria for an impairment listed in the Listing of Impairments in appendix 1 of Subpart P of part 404 of this chapter, or if it is functionally equal in severity to a listed impairment.

*Id.* § 416.924(d). If the "functional equivalency" test is satisfied, and the statute's durational requirement is also satisfied, only then will the child be found to be disabled. *See id.; see also, e.g., Diaz v. Apfel,* 994 F.Supp. 541, 546 (S.D.N.Y.1998).

The regulations provide that an impairment will be found to be functionally equivalent to a listed impairment if it results in extreme limitations in one area of function or marked limitations in two areas. *See* 20 C.F.R. § 416.926a(b)(2). According to Carballo, one marked impairment and two moderate impairments should be sufficient under the new formula. She reasons that the old standard recognized that two moderate impairments functionally equaled one marked impairment when it adopted the rule that comparable severity could be shown by three moderate impairments as well as by "one marked plus one moderate" combination, 20 C.F.R. § 416.924e(c)(2) (1996), and that although the new regulations have heightened the disability standard, the Commissioner has never suggested that the relative values of marked and moderate impairments have been changed.

■ The Commissioner counters that this suggested formula is contrary to the plain language of the regulation. However, the regulations are only to be used as a guide. As the Second Circuit acknowledged in *Quinones,* albeit while discussing the former law, "[a]lthough the regulations suggest that a finding of one marked impairment and one moderate impairment will usually result in a finding of disability, they stress that this is

not an automatic conclusion." *Quinones,* 117 F.3d at 36–37 (citing, for example, 20 C.F.R. § 416.924e(a) (1996) ("The guidelines illustrate a level of impairment severity that is generally, though not invariably, sufficient to establish comparable severity.")). Carballo's suggestion has merit, and should be considered by the ALJ on remand.

Aside from the change in the combination required to be considered disabled, the former "domains" of cognition and communication have now been collapsed into one "area" of cognition/communication. *See* 20 C.F.R. § 416.926a(c)(4) (1998).[2] Moreover, the personal/behavioral domain, now referred to as the area of personal functioning, has been narrowed in scope so as to exclude certain sorts of "maladaptive behaviors." *Id.* § 416.926a(c).

The PRWORA applies to all children who filed disability claims on or after August 22, 1996, as well as applicants whose cases were not finally adjudicated by that date. *See* 110 Stat. 2105 § 211(d)(1)(A)(ii). Because Heriaberto's case was making its way through the appeal process as of August 22, 1996, the new statutory criteria applies.

As demonstrated by the discussion above, the new standard is more stringent than the old standard. Accordingly, any claim that would have been denied under prior law would also be denied under the PRWORA. *See, e.g., Diaz,* 994 F.Supp. at 547. Thus, if a decision by the Commissioner rendered under the prior law were supported by "substantial evidence," the new standards would not need to be addressed. After all, it follows that the decision of a denial of benefits would necessarily prevail pursuant to the more restrictive standards. The Commissioner's decision, therefore, would be affirmed.

However, if, as is the case here, the decision requires reversal under the prior law, the appropriate course is remand so that the claim may be determined according to the new standards. *See Scullark,* 1998 WL 472059, at *6 (noting that "where the ALJ's

decision under the old law is not supported by substantial evidence, the appropriate remedy is to remand the action to allow the Commissioner to apply the new standard"); *Winnik v. Chater,* No. 95 Civ. 0695, 1998 WL 151041, at *5 (S.D.N.Y. Apr.1, 1998) ("Because [the child claimant's] case was still pending in this Court as of August 22, 1996, remand is appropriate so that her claim may be determined according to the new standards." (footnote omitted)); *Williams v. Appel,* No. 96 Civ. 1292, 1997 WL 681305, at *4 (S.D.N.Y. Nov.3, 1997) (finding remand appropriate and stating that "it is not the role of the district court to make a *de novo* determination on an application for benefits"); *Tracy,* 1998 WL 765137, at *3 n. 3 ("In the event that I find [the ALJ's decision] was not supported by substantial evidence, the appropriate remedy would be to remand the action to allow the Commissioner to apply the new standard.").

Accordingly, what follows is a review of the ALJ's decision under the old law for the purpose of determining whether remand is warranted. When the case is again before the ALJ, she is to apply the current law.

## IV. *The ALJ's Determination That Heriaberto Was Not Disabled Is Not Supported by Substantial Evidence*

■ In performing the four-step sequential analysis, the ALJ correctly found that Heriaberto had never engaged in substantial gainful activity and that he had two severe impairments which imposed more than a minimal or slight limitation in his ability to engage in age-appropriate activities. These impairments consist of a receptive and expressive language delay and a learning disability. The ALJ also reasonably determined that the impairments, singularly or in combination, were not "listed" impairments. It is the ALJ's determination at the IFA stage that is not supported by substantial evidence.

---

**2.** It is interesting to note that in an official interpretation of the new regulations published in March 1998, the Commissioner has again separated cognitive disorders and "speech" disorders, ruling that a child with marked impairments in both areas will satisfy the functional equivalence test. *See* Social Security Ruling ("SSR") 98–1p (Mar. 30, 1998).

The ALJ found that Heriaberto had a moderate limitation in only one domain—cognitive development and functioning—and that in all other areas in which he demonstrated limitations, the limitations were less than moderate in degree. Specifically, she determined that the language delays constituted a "less than moderate" impairment in the domain of communication, that there was a less than moderate impairment in the area of concentration, persistence, and pace, and that there existed "slight" limitations in the social abilities and personal/behavioral function domains.

Carballo does not contest the decision regarding the area of social abilities. Likewise, there is no dispute about the domain of motor skills. Rather, it is the findings in the domains of cognitive and communicative functions, concentration, persistence, and pace, and the personal/behavioral function domain that, upon analysis, are not supported by substantial evidence.

## A. *Cognitive Function*

■ Cognitive function refers to the child's "ability to progress in learning the skills involved in reading, writing, and mathematics." 20 C.F.R. § 416.924d(h)(1) (1996). It is useful to keep in mind that cognition is not identical to intelligence. A child with low intelligence can have an impairment of cognitive function. A child of normal intelligence can also be cognitively impaired if some condition other than a low IQ severely affects the child's ability to progress in the skills involved in reading, writing, and arithmetic. *See Quinones,* 117 F.3d at 31–32; *Winnik,* 1998 WL 151041, at *3.

Heriaberto's IQ testing in 1995 revealed that his verbal IQ was borderline, performance IQ was average, and full scale IQ was low average. These results, but more importantly, the overwhelming evidence in the record that Heriaberto has made little or no progress in learning, do not support a mark of "moderate" in this domain.

In the middle of his third year of schooling, Heriaberto not only could not read on grade level, but he could not read at all. As a third-grader, Heriaberto did not know the alphabet. Oral reading comprehension was "in great delays and deficits." Writing skills were nonexistent. Academic progress in all subjects was close to nil. The evidence available to the ALJ indicated that Heriaberto made little to no progress between his 1995 evaluation and the ALJ's July 1996 decision.

The Commissioner, and the ALJ in her findings, point to progress he had made in mathematics to defend the finding of a moderate impairment in the cognitive domain. The ALJ may have overemphasized this progress. For example, in the report by one of Heriaberto's bilingual speech education teachers in which the progress in mathematics was mentioned, the teacher also asserts that Heriaberto could not recognize letters of the alphabet, words, simple sounds, or remember the material covered in class. This corroborates Carballo's testimony in the administrative hearing that her son is unable to read and write and has difficulty functioning in a classroom. Consequently, he was held back in the third grade.

Carballo also testified that Heriaberto cannot remember the names of his three older brothers, and that if she tells him that they are celebrating his younger brother's birthday, Heriaberto will ask whether it is her birthday that is being celebrated. Indeed, the bilingual psychologist reported that Heriaberto's short-term auditory memory is in the deficient range.

The ALJ seemed to ignore the reports from another of Heriaberto's special education teachers who reported that Heriaberto uses his fingers to read letters, not words, that he is unable to decode or read any words, and that he is unable to initiate any written sentences in either English or Spanish. His teacher also indicated that he never finishes his school work on time or does not do it at all. The ALJ did not give proper weight to the observations of Heriaberto's teachers, who had dealt with him on a daily basis. *See Quinones,* 117 F.3d at 35 (holding that proper weight must be given to testimony and submissions by individuals who have or have had significant contact with the child).

Carballo submits that Heriaberto's impairment in the cognitive domain is marked. She reasons that his cognitive function is

lower than that of the claimant child in *Quinones*, who, the Commissioner conceded, was markedly impaired in the cognitive domain. The Second Circuit described the child as follows:

> Jennifer also has a severe learning disorder. Although I.Q. tests reveal average intelligence, she has done poorly in school. In second grade, she could not recognize many letters and was essentially unable to read. In the middle of the fourth grade, having already repeated the second grade, her reading abilities were still at a first grade level. Although the precise nature of her learning disorder is unclear, it appears to result from an "auditory short term memory and sequencing deficit," which makes it difficult for her to process information.

*Quinones,* 117 F.3d at 31. The ALJ had "found that Jennifer suffers from a marked impairment in the area of cognition because of her learning disability." *Id.* at 32.

According to Carballo, Heriaberto's intelligence is far lower than Jennifer's, his performance on standardized reading tests is far worse, and he is, additionally, impaired on all measures of academic achievements. She concludes that if Jennifer was found to have a marked impairment of the cognitive function, Heriaberto cannot be found to have less. By contrast, the Commissioner asserts that reliance on *Quinones* as support for that proposition is misplaced because in that case the Commissioner had found that the child had a marked impairment in this area and the plaintiff did not dispute that finding. *See id.*

Although the *Quinones* court did not address any specific evidence regarding the child's cognitive function, from the description given of Jennifer, Heriaberto's condition indeed appears more severe. Still, the comparison, while enlightening, cannot by itself support a finding of a marked impairment.

However, a review of the entire record *does* support the conclusion that Heriaberto has at least a marked impairment in the domain of cognitive development and function. As shown above, the ALJ's finding of a moderate impairment is not supported by substantial evidence. As shown above, she failed to give the observations of his teachers a proper weight and latched onto the idea that Heriaberto's slight progress in mathematics, along with his full scale IQ score of low average, warranted a "moderate" rating.

### B. *Communicative Function*

■ The regulations define the communicative function as a child's "ability to communicate pragmatically (*i.e.,* to meet [his] needs) and conversationally (*i.e.,* to exchange information and ideas with peers and family or with groups such as [his] school classes) in a spontaneous, interactive, sustained, and intelligible manner." 20 C.F.R. § 416.924d(h)(2). The ALJ's determination that Heriaberto suffers from a less than moderate limitation in the domain of communicative development and functioning fails under a substantial evidence review.

The ALJ seemed to have relied almost exclusively on a single evaluator's statement that the expressive and receptive language delays were, respectively, "mild to moderate," and "moderate." Taken together, she assigned a less than moderate valuation to Heriaberto's communicative functioning.

A careful scouring of the record, however, suggests that an impairment of receptive communication may be at the root of many of Heriaberto's problems. In 1995, his verbal IQ was 23 points lower than his performance IQ, and the psychologist who performed the IQ testing commented that "communication problems were evident throughout the assessment, and interfered with his overall performance." (Tr. at 117.) Receptive language ability is the child's ability to receive information through speaking and reading; expressive language ability is the ability to send information. Heriaberto's 1995 scores on standard tests of receptive communication ability placed him at the 66% and 55% of age expectancy, which Carballo contends is well within the marked range.

Granted, the regulations provide that evaluation of the domains by an expression of a percentage of the child's chronological age, while the practice for children from birth to age three and even for preschoolers aged three to six, is "less precise" the older the child becomes. 20 C.F.R. § 416.924(b)(2);

*see id.* § 416.924c(2). However, such analysis is nonetheless informative.

As indicated in the prior section, the record is replete with comments regarding Heriaberto's inability to read or recognize the letters of the alphabet. Additionally, one of the psychologists who examined Heriaberto stated that he had a communicative disorder. This record warrants a finding that his receptive language development is at the least more than a moderate impairment, and maybe even marked. Even taking the receptive category together with his expressive language development ranking—as the ALJ must have (although such an "averaging" is not commanded by the regulations, *see* 20 C.F.R. § 416.924e(b))—a grade of "less than moderate" is not supported under the requisite standard.

### C. *Concentration, Persistence, and Pace*

■ The regulations define "concentration, persistence, and pace" for Heriaberto's age group as the child's "ability to engage in an activity, such as playing or reading, and to sustain the activity for a period of time and at a pace appropriate to [the child's] age." 20 C.F.R. § 416.924d(h)(6). According to the regulations, an impairment in this domain is moderate if the child is "frequently unable to complete age-appropriate complex tasks, and occasionally unable to perform simple age-appropriate tasks adequately." *Id.* § 416.924e(c)(2)(ii). A "less than moderate" ruling in this area must be overturned pursuant to the substantial evidence standard.

In making her assessment, the ALJ put too much weight on the following pieces of evidence: the statement by a psychologist that Heriaberto was attentive during testing, the report by the speech and language evaluator that Heriaberto followed directions and was attentive to all stimuli presented, and the observation by another psychologist that Heriaberto was able to concentrate playing with his toy but showed poor attention during the psychological interview. Indeed, as to the speech and language evaluator's remark, for example, that Heriaberto "attended to all stimuli" during the examination, the ALJ ignored that same evaluator's judgment that Heriaberto "has poor and limited attention and retention span and [is] easily distracted

..., needs constant approval, praise, support, and constant repetition ..., [and] has a tendency to loose [sic] focus and concentration of what was explained or asked...." (Tr. at 124.)

The record in this case is notable for its many, striking, and unanimous references to the difficulties Heriaberto experiences in this domain. The record reflects that Heriaberto needed "constant" support and repetition, (Tr. at 124), that in the second grade he "never" finished his work and was "always" daydreaming, (Tr. at 90–92), and that in the third grade he had to be prompted "nearly constantly" to stay on task. (Tr. at 151.) One of Heriaberto's special education teachers explained that Heriaberto was prone to staring blankly ahead and daydreaming, and that he was constantly unfocused. This, opined his teacher, hindered his ability to progress in school. These comments lend credibility to Carballo's statements at the hearing that her son was easily distracted, frequently daydreamed, and found it difficult to remain on task.

The psychologist who reported that Heriaberto's attention and concentration in relating to the interview and his surroundings was poor did observe that he was "concentrated in playing, distracted, and oblivious to the environment." This psychologist also noted his propensity to daydream. The ALJ may have given too much emphasis to the fact that Heriaberto was able to concentrate on his toy when she evaluated the area of concentration. "[E]vidence that [the child] can complete simple age-appropriate tasks sheds little light on the question of whether [his] disability impairs [his] concentration, persistence, and pace while completing more complex tasks." *Winnik*, 1998 WL 151041, at *4. In noting that "the Commissioner emphasize[d] Jennifer's ability to complete tasks that she enjoyed and homework that did not involve reading, as well as her ability to paint, swim, and play sports," the Second Circuit in *Quinones* explained that "[a]lthough these activities suggest that Jennifer is 'sometimes' able to complete simple, age-appropriate tasks, they do not refute ... [evidence that Jennifer] has 'constant' difficulty in completing both simple and complex

age-appropriate tasks." *Quinones,* 117 F.3d at 35.

As the regulations represent, a "marked or moderate limitation may arise when several activities or functions in a domain or behavior are impaired or even when only one is impaired." 20 C.F.R. § 416.924e(b). That Heriaberto was able to concentrate on his toy during the interview does not foreclose a finding of marked impairment in this area when the remaining record supports that conclusion. Consequently, concentration on a toy or small object while ignoring the surrounding environment is a characteristic found in autistic children.

The record before the ALJ does not contain substantial evidence to support the conclusion that Heriaberto's impairment in the area of concentration, persistence, and pace is less than moderate. As demonstrated by the repeated statements concerning Heriaberto's constant daydreaming and his difficulty to complete given tasks, especially in the academic realm, the evidence reflects a marked impairment in this domain.

### D. *Personal/Behavioral Patterns*

■ The regulations define the personal/behavioral function as a child's "ability to help [him]self and to cooperate with others in taking care of [his] personal needs and safety; to respond appropriately to authority and school rules; to manifest a sense of responsibility for [him]self and respect for others; to adapt to [his] environment; and to learn new skills." 20 C.F.R. § 416.924d(h)(5).

In finding only a "slight limitation" in this area, the ALJ focused on the determination that Heriaberto experienced no social or emotional problems that interfered with his ability to adjust and progress in an academic setting, displayed no severe emotional disruptions, and was able to play with other kids and ride the bus. The ALJ failed to address evidence that Heriaberto cannot or will not perform basic self-care activities,[3] such as bathing, dressing, and tying his shoes.

Carballo reported that she has to bathe Heriaberto properly. One of his teachers reported that he would refuse to perform age-appropriate self-care acts, such as toileting, washing, and dressing. The only psychologist to consider the significance of these behaviors felt that they warranted psychotherapy. She asserted that Heriaberto "goes to the shower and just stays there[,] he doesn't use soap or he comes out immediately. Patient needs to be assisted with his shoelace, to bathe, etc. He sleeps with the mother in the same bed on and off." (Tr. at 134.) She also found that Heriaberto needs to act more maturely.

A child may be considered moderately or markedly impaired in a domain even if only one function or activity within the domain is affected, as long as there is a serious interference with the ability to function independently, age-appropriately, and effectively on a substantial basis. *See Quinones,* 117 F.3d at 36 (finding that the failure to adhere to a diabetic diet represents a probable moderate impairment in the personal/behavioral function domain even though the child "respects authority, follows rules, and gets along with her peers"). Here, although Heriaberto exhibits no trouble relating to authority and gets along reasonably well with his peers, he is frequently unable to perform basic self-care activities independently. Carballo urges that this is the Commissioner's textbook example of a child with a moderate impairment in the domain of personal/behavioral function. *See* 20 C.F.R. § 416.924e(c)(2)(i) (1996) (listing a child's frequent inability to perform self-care activities as an example of functioning at the moderate level in the personal/behavioral domain).

The recorded evidence may suffice to demonstrate a moderate impairment in Heriaberto's personal/behavioral patterns. However, because the ALJ did not address this evidence in her findings, the appropriate course is remand so as to allow the ALJ to consider in the first instance the weight that such

---

**3.** As mentioned above, Carballo has not contested the determination of a slight limitation in the social abilities domain. The ALJ appears to have collapsed this domain with that of personal/be-

havioral function, as the only reference to Heriaberto's personal function is that he sleeps in the same bed with his mother on and off.

evidence should be accorded. *See Quinones,* 117 F.3d at 36.

In sum, the ALJ's assessments in the domains of cognitive and communicative functions, as well as in the area of concentration, persistence, and pace, are not supported by substantial evidence. Furthermore, the determination regarding Heriaberto's personal/behavioral function warrants a remand of that area. Having found that Heriaberto has a marked impairment in two domains and a moderate impairment in at least one domain, he would have qualified for SSI benefits under the law in effect at the time the ALJ rendered her decision. However, as explained above, the law has changed. Accordingly, the case is remanded to allow application of the new standard to Heriaberto's claims.

### V. *New Evidence*

■ The Social Security Act provides that a court may remand a case for consideration of additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has further refined this standard as follows:

> [The] applicant must show that the proffered evidence is (1) " 'new' and not merely cumulative of what is already on the record" and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently. Finally, the claimant must show (3) good cause for her failure to present the evidence earlier.

*Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir. 1988) (citations omitted); *see Jones v. Sullivan,* 949 F.2d 57, 60 (2d Cir.1991). As most of the evidence proffered by Carballo as "new evidence" satisfies this standard, that evidence may be considered by the ALJ on remand.

Carballo has proffered evidence consisting of the results of Heriaberto's triennial evaluation by the New York City school system in the summer of 1998 and individual psychotherapy records covering the period December 5, 1996, to April 29, 1998, that became available after the date of the ALJ's July 26, 1996, decision.

The school district triennial evaluation was conducted in June/July 1998 when Heriaberto was eleven and one-half years old, thus about three and one-half years older than he was during the 1995 evaluation. In general, it shows little change between Heriaberto's raw score performances in 1995 and 1998. As Carballo notes, as a result, his performances relative to age showed significant declines.

The results of a bilingual educational evaluation performed on June 18, 1998, establish that Heriaberto is still a nonreader and nonwriter. His English language broad reading score was "K.2," *i.e.,* that of a student in the second month of kindergarten. His "age equivalent" for this test was "5.3," *i.e.,* five years, three months. Reading comprehension was K.0, age equivalent 3.5. He was able to identify some letters of the alphabet and the word "to"; he could not read "must," "dog," and "in." He could write isolated letters but no words, except his first name. He was described as "[e]xtremely delayed for his present age/grade expectancy." (Pl.'s Br. in Supp. of 12(c) Mot.App. A at 30.)

Repeat psychological testing showed similar results. Performance IQ was still average. Full scale IQ had declined from low average to borderline, and verbal IQ from borderline to the mentally retarded range. There was now a 35 point spread between verbal and performance scales, up from 23 in 1995.

A current language assessment, though not described in detail, now classified Heriaberto as exhibiting "moderate to severe" receptive and expressive language delays. These delays were said to "impact his learning in the classroom." (Pl.'s Br. in Supp. of 12(c) Mot.App. A at 12, 36.) It should be noted that the school psychologist believed that Heriaberto's poor performance on standardized intelligence testing was primarily

language-based due to poor auditory processing skills.

Two other aspects of the triennial assessment deserve mention. Although none of the reports focuses on concentration issues, Heriaberto's difficulties with concentration are mentioned both by the school psychologist and by an education evaluator who observed Heriaberto in the classroom. There are also several references to continuing immature behaviors, including, at the age of eleven and one-half, problems with basic skills such as bathing and hair combing.

The psychotherapy records reveal that Heriaberto began at the end of 1996 to receive psychotherapy and medication for what is described as either pervasive developmental disorder or autism. The record is sketchy but the diagnosis was apparently based on Heriaberto's history of developmental delay in the area of language, his impaired social skills, and a markedly restricted repertoire of activities and interests. The sole mental status examination shows, in addition to other abnormal findings, that Heriaberto is "fidgety," "evasive," "restless/-anxious," "easily distracted," and "withdrawn." (Pl.'s Br. in Supp. of 12(c) Mot.App. B at 7.) Treatment discontinued in May 1998 when the family moved to Pennsylvania. Heriaberto was described has having made no progress towards his therapy goals.

 This evidence satisfies, for the most part, the first and third prongs of the *Tirado* test. The evidence indicates that many of Heriaberto's conditions are worse than they were three years ago. Thus, the evidence cannot be described as cumulative. Moreover, since much of the evidence did not exist during the administrative proceedings, there was just cause for not presenting it. *See Tirado v. Bowen*, 705 F.Supp. 179, 181 (S.D.N.Y.1989). The Commissioner submits that the earliest of the proffered documents is dated November 20, 1996, and the record demonstrates that Carballo previously submitted to the Appeals Council documents dated as late as April 14, 1997; thus, Carballo had the ability to submit at least some of the proffered evidence to the Commissioner at an earlier stage in these proceedings. Those documents that were submitted to the Appeals Council may be reviewed by the ALJ on remand under the new disability standard as they are part of the record in this case. However, those documents, if any, not submitted to the Appeals Council but available prior to the time the administrative record was closed may not be utilized on remand.

The second prong, materiality, is also met. Granted, as asserted by the Commissioner, the period of time covered by the ALJ's decision ended on the date of that decision—July 26, 1996,—whereas the evidence submitted by Carballo refers to Heriaberto's condition over a subsequent two-year period—between November 1996 and July 1998. According to the Commissioner, this precludes it from passing the *Tirado* test. However, "[w]hile new evidence does not require remand where it proves only a later-acquired disability or subsequent deterioration of the previously non-disabling condition, later developments which shed light on the seriousness of the claimant's condition at the time of the ALJ's decision are relevant." *Tracy*, 1998 WL 765137, at *6.

The diagnosis of autism by Heriaberto's therapists, for instance, sheds new light on the nature and severity of Heriaberto's condition since infancy. The 1998 triennial test results, which show that Heriaberto made virtually no progress in learning between the ages of eight and eleven and one-half, constitute significant evidence, not only that he has not done well in the past three years, but also that his capacity for learning is probably more significantly limited from the start than anyone at first suspected.

Additionally, as for the second aspect of the materiality prong, it is a reasonable possibility that the 1998 triennial evaluation and the individual psychotherapy records would have influenced the ALJ to decide Heriaberto's application differently. Thus, that material unavailable during the pendency of the administrative proceedings is new and material within the meaning of 42 U.S.C. § 405(g).

On remand, the ALJ is directed to utilize the new evidence, as well as the evidence submitted to the Appeals Council, to the extent that such evidence illuminates Heria-

berto's condition during the relevant time period.

### Conclusion

For the reasons set forth above, the decision of the ALJ is reversed, and the case is remanded for consideration under the current law. Additionally, Carballo's motion for submitting new evidence is granted in accordance with this opinion.

It is so ordered.