Gladys SOTO, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security, Defendant.

No. 398CV218(GLG).

United States District Court, D. Connecticut.

Nov. 15, 1999.

Meryl Anne Spat, Waterbury, CT, for plaintiff.

Deirdre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for defendant.

## *OPINION*

GOETTEL, District Judge.

This action is brought under 42 U.S.C. § 1383(c)(3) to review a final decision rendered by the Commissioner of the Social Security Administration holding that Plaintiff, Gladys Soto, was not entitled to supplemental security income benefits ("SSI") under 42 U.S.C. § 1382c(a)(3)(A). Plaintiff has moved for an order reversing

or remanding the decision of the Commissioner. [Doc. # 9]. Defendant has cross-moved for an order affirming the decision of the Commissioner. [Doc. # 12]. For the reasons set forth below, the Court holds that the decision of the Commissioner is supported by substantial evidence and, therefore, affirms that decision.

## BACKGROUND

### Administrative Proceedings

Plaintiff filed an application for SSI benefits on October 4, 1994, alleging disability since July 16, 1991 [1] due to "back pain, disc and nerves." (R. 216, 280). On January 26, 1995, the Social Security Administration denied her application. (R. 231–35). On reconsideration, this determination was affirmed. (R. 258). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ")(R. 264), which was held on March 19, 1996. Plaintiff was represented by counsel at the hearing and testified with the aid of an interpreter. A vocational expert also testified. (Transcript at R. 38–59). The ALJ found that plaintiff's impairments did not prevent her from performing her past relevant work as an assembler and, therefore, she was not under a "disability" and was not entitled to SSI benefits. (R. 20). On April 23, 1996, plaintiff filed a request for review of the hearing decision by the Appeals Council. (R. 9). The Appeals Council concluded that there was no basis for granting her request for review and, therefore, the ALJ's decision stands as the final decision of the Commissioner. (R. 5). Plaintiff then filed this complaint on February 8, 1998, appealing the decision of the Commissioner.

### Standard of Review

■ Our review of a social security disability determination involves two levels of inquiry. First, we must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, we must decide whether the determination is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987). "Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Rodriguez v. Califano*, 431 F.Supp. 421, 423 (S.D.N.Y.1977). In determining whether there was substantial evidence to support the Commissioner's decision, we are required to scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings. *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir.1997). However, we may not decide facts, reweigh evidence or substitute our judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir.1993); *Reyes v. Harris*, 486 F.Supp. 1063, 1067 (S.D.N.Y.1980).

### The Record

Plaintiff was born on June 1, 1955,[2] in Puerto Rico. She came to the United States in approximately 1984. (R. 43). She has a sixth grade education (*id.*) and is fluent in Spanish, but not English. (R. 41). Plaintiff has three children, two of whom still live with her (presently ages 8 and 12), (R. 46), and for whom she receives AFDC benefits. She was last employed as an assembly line worker in 1991. She worked in a factory operating a machine that applied paint or lacquer to the covers of cosmetics and perfumes. (R. 43). In Puerto Rico, she had worked on farms doing heavy labor. (*Id.*). Plaintiff was 32

---

1. *But see* Note 3, *infra*.

2. Plaintiff would be considered a "younger" person under the SSI regulations, 20 C.F.R. § 416.963(b).

years old at the time of the onset of her alleged disability.[3]

### Medical Evidence
#### Plaintiff's Physical Impairment

The first reference in the medical records to plaintiff's back problems is a January 14, 1991, entry by Dr. Manuel Nunes, with whom she had been treating for four years, in which he diagnosed lumbosacral sprain. (R. 428). This diagnosis was repeated on August 12, 1992. He noted no history of trauma. Her neurological examination was normal. (R. 141, 428). A CT Scan of the lumbar spine that same day showed a moderate sized posterior plate spur at L4–L5 along the superior end plate of L5, with a diffuse disc bulge partially obliterating both L5 roots, with hypertrophic posterior facet joints at L4–L5. (R. 144). An x-ray taken that same day showed no evidence of acute compression fracture and normal alignment of the vertebral bodies. (R. 143). In March of 1993, Dr. Nunes' notes indicate that plaintiff was being seen at the Chase Clinic for her low back pain, although we do not have any records from the Chase Clinic. In May of 1993, plaintiff saw Dr. Nunes again for chronic low back pain and he referred her to St. Mary's Hospital Clinic.

On July 19, 1993, she was seen at St. Mary's Clinic. The notes state that plaintiff gave a history of having fallen six years ago and that she had experienced chronic low back pain since that time. About one year prior (in 1992), the pain became worse and began radiating into the right buttock, posterolateral thigh, and calf, to the sole of her foot. Plaintiff stated that, because the sole of her foot was sore, she could not walk for long distances. She complained of paresthesias of the right calf but denied numbness and weakness. Nevertheless, she exhibited a nor-mal gait and full range of motion in her back. Upon physical examination, the physician assistant's impression was "L4–5 herniated disc, plantar fasciitis." Motrin was prescribed and an MRI of the LS spine was ordered. Plaintiff was instructed to begin physical therapy. (R. 344). The MRI of the lumbar spine showed "[n]o focal disc herniation or spinal stenosis. . . . Conus and distal sac were unremarkable." (R. 423). The radiologist's impression was "no focal disc herniation or spinal stenosis." (*Id.*).

The following month, she returned to St. Mary's Clinic, complaining of continuing low back pain, reaching into her right thigh and foot, and sometimes radiating into her neck and head, causing headaches. She stated that the pain worsened when she sat or stood for long periods of time. Both Motrin and the physical therapy helped her pain. Upon physical examination, her back was tender to palpation of the L3–L5 area and right and left paralumbar areas and positive for mild spasm on the right. The impression was "improved chronic low back pain." She was to continue physical therapy for six weeks. (R. 342). Her next appointment at St. Mary's was on October 20, 1993. She continued to complain of back pain on both sides of the lumbar area. She described herself as "very active" and stated that she had just recently moved her furniture, which had increased the pain. Her leg pain had improved. Again, she indicated that Motrin helped her pain. Upon physical examination, her back dynamics were full but mildly painful. The impression was "musculoskeletal pain." (R. 342).

In January, 1994, she stated that she was taking a number of pain medications and muscle relaxants for her back pain. (R. 172).

---

**3.** At the time of plaintiff's disability evaluation by the State in January, 1995, she gave a three-year history of low back pain. However, in 1992, plaintiff had applied for a period of disability, disability income benefits ("DIB"), and SSI. According to the ALJ's decision denying that application, plaintiff stated that she had been disabled since July 19, 1987, because of back and neck pain. (R. 205–10). Plaintiff reconfirmed this date at the hearing before the ALJ on this application. (R. 31).

On December 27, 1994, she was evaluated for the Connecticut Bureau of Disability Determination by Dr. Robert Nims for her back pain. Her chief complaints were pain in the low back, radiating to the right thigh and calf, down to the toes, pain and numbness in the right shoulder, radiating distally to the palms. She stated that she had experienced back pain for four or five years and that it was of slow onset. She related that she had fallen many times on the snow, with resulting back pain, but paid no attention until now. She described the back pain as "something pulling [her] muscles" and stated that she fell down the stairs four years ago and at that time her left leg started shaking. She stated that two years ago she awoke one morning with quivering in her right arm and leg and that now she cannot lift anything. She stated that she could only stand for one or two minutes before the left leg began shaking, that she could walk one block, and could sit for one-half hour intervals before needing to stand. Significantly, these same complaints do not appear in the records of Dr. Nunes or from St. Mary's Clinic. She also complained of occasional occipital headaches at times when she had low back pain. On examination, palpation of the whole thoracic and lumbar spine elicited pain. The paraspinal muscles were tense, more so on the right than the left. Straight leg raising on the right produced pain at 30 degrees, but only slight pain on the left at 90 degrees. Pin sensation on the right was decreased from the base of the neck down the right upper extremity. The sensory perception was less in the left foot than the right. Arm raising, grip strength, and ankle strength were normal. The impression was "mild degenerative joint disease of the lumbar spine, with a diffuse disc bulge at the L5–S1 level; Right thigh, calf and foot pain, possible related to the disc bulge; subjective pain and numbness of the right upper extremity, cause undetermined." Dr. Nims indicated that, due to language problems, it was difficult to get a reliable history. (R. 309–310).

On January 7, 1995, during her State disability mental status examination by Dr. Diane Badillo–Martinez, plaintiff stated that she had experienced back pain for approximately six years. She indicated that she had fallen at work and, on another occasion, in the street, but she stated that she never considered these incidents to have brought on the back pain and she did not pay attention to the pain. The pain was described as constant and radiating to the right leg and arm. The intensity of the pain was described as typically "8" on a 1–to–10 scale, the least pain being a "6" and the worst a "9." She stated that she also experienced daily pain in the nape of her neck that radiated up to her head. She stated that she attempted to attend to all the household chores independently, but had learned to take rest intervals frequently in order to control the intensity of the pain. She coped with her pains by lying down and shifting positions. (R. 311). Dr. Badillo–Martinez noted that she ambulated independently without any noticeable gait problems. (R. 312).

A functional capacity assessment performed on January 11, 1995, indicated that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, could stand or walk about 6 hours in an 8–hour workday, could sit (with normal breaks) for about 6 hours in an 8–hour workday, she could push and pull an unlimited amount, which indicated that she could perform work of a light level of exertion. (R. 228).

### Plaintiff's Mental Impairment

On January 5, 1995, plaintiff underwent a mental status examination by the Connecticut Bureau of Disability Determination by Dr. Diana Badillo–Martinez. Plaintiff denied any psychiatric hospitalizations but admitted to a suicidal gesture by overdose many years ago. She denied alcohol, illicit drug use, and nicotine intake. She reported having subjective feelings of depression and indicated that she cried easily, as well as becoming easily irritated with the children. She did not understand

why she reacted that way. She stated that she had recently begun individual psychotherapy. (R. 311–13). Her immediate memory was described as poor; long-term recall was adequate. Her mood was mildly depressed and her outlook negative. Her attention span was within normal limits. She described problems with sleep. Dr. Badillo–Martinez states that plaintiff

reports to have chronic back pains that interfere with her activities of daily living and sleep. The disruptions to her life, activities, and independence, as well as the decreased feeling of well being, contribute to feeling of anxiety and depression. Affect is described as labile and irritable, which in circular fashion further exacerbates the perception of pain. [Plaintiff] lacks full awareness of pain coping skills and the impact her emotional distress exerts on pain perception.

It is recommended that she continue individual psychotherapy to develop pain coping skills, relaxation techniques to ameliorate anxiety and depression. In addition, an orthopedic evaluation of the back pain is also recommended.

(R. 312–13).

Plaintiff was seen for her depression and anxiety in January, 1995, by the Catholic Family Services, Inc., where she gave a history of having always felt anxious and nervous but her symptoms had increased in the past six months after her family from Puerto Rico came to visit and brought back negative memories. Her first husband [4] had also recently died. (R. 315). Plaintiff had been to five sessions at the Catholic Family Services as of March 22, 1995. (R. 314). It was anticipated that her treatment would take one year. (R. 317).

In January, 1995, Dr. John Tomassetti, Ph. D., evaluated plaintiff's medical records and completed a Psychiatric Review Technique Form. (R. 241–53). He as-

sessed the functional limitations caused by her depression as: "slight" in terms of restrictions on activities of daily living; "slight" in terms of her difficulties in maintaining social functioning; "often" in terms of difficulties of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner; and "never" as to episodes of deterioration or decompensation in work or a work-like setting. No functional limitations were manifested at the Listing level of severity. (R. 247).

Plaintiff was also evaluated at St. Mary's Hospital's Behavioral Health Institute by Dr. Mario Perez in February, 1995. Her chief complaint was feeling anxious, nervous, depressed and that she had not been sleeping well for the past four or five months. She stated that she has frequent headaches, was easily irritated, and sometimes experienced eating difficulties. She gave a history of having been treated at the Emergency Room on April 24, 1994, for chest pain, which she was told was caused by anxiety. She related that sometimes she heard voices calling her name and that these hallucinations made her anxious. She further admitted that about two months previously she had some suicidal ideation. The diagnosis was "Major Depression, Single Episode, with Psychotic Features (Mood Congruent)." Antidepressants were prescribed. (R. 328–29). She was subsequently seen at St. Mary's over the next ten months. (R. 330, 334–37). By September, 1995, plaintiff reported that she was feeling better but still was not sleeping well. In November, 1995, her medications were decreased.

### The Hearing Before the ALJ

#### Plaintiff's Testimony

At the hearing before the ALJ, plaintiff gave the following testimony regarding her physical and mental condition: She has pain in her back that "comes and goes,"

---

4. This appears to be an error, since plaintiff states that she had never been married. (R. 216). This may refer to someone with whom she had a relationship, since there are other references in the medical records to her having had several relationships.

but when she experiences it, it is so strong that nothing takes it away, and it causes her to be depressed. (R. 44). The prescribed medications help very little. (R. 45). She has very little strength in her right arm and right leg. (R. 44). She cannot bend over to pick up things. Her arms tire very quickly and, because of this, she does not make the beds everyday. (*Id.*). She cannot exert herself. She cannot stand for very long. When she is washing dishes, she has to take a break and sit down. (*Id.*). Her nerves affect her stomach. She cannot be where there are lots of people. When she is at home with her children, she gets hysterical when they are playing, and has to go into the corner to try to achieve some tranquility. (*Id.*). She takes six different kinds of medication for her depression. (R. 45). She sometimes shouts at her children. She stated that she is "very bad on her nerves." (R. 46).

She then described a typical day. She gets up at 6:30 and makes sure that her children get breakfast. While the children are at school, she does nothing. If her back is not feeling well, she just sits down and tries to watch some television, but she states that she cannot sit for very long, and has to lie down. (R. 46). "All of this annoys [her]." (R. 47). If she is not feeling well, she leaves everything in the house "as is," and that gets her into a depression. (*Id.*). When the children get home from school, she does everything for them that she possibly can do. She cooks for them and tries to help them with their homework. (R. 48). She can vacuum, but only one room at a time and only once a week. (R. 55). She also does the laundry, but sometimes it takes her several days to wash and dry and fold the laundry. (*Id.*).

Plaintiff could not estimate in minutes how long she could stand or sit but stated it was "very, very little. . . . even laying down, [her] back bothers [her]." (*Id.*). She stated that she can walk less than one-half hour before her leg loses strength. (R. 52). She also said that she has head-aches every day, some days they are acute and other days less, for which she takes Tylenol but if it does not work, she is like a "mad old man or a bad person." She thinks that the headaches are caused by the pain in her back reaching her neck. (R. 49). She described the pain as "9" on a 1-to-10 scale "because it is all the time." (*Id.*). Some days the pain is even a "10." (R. 50). She states that it interferes with her ability to carry on a conversation, to concentrate, and makes her irritable. (R. 50). She has difficulty being around a lot of people. (R. 54). She states that her older son has to help her dress. (R. 51). However, three or four days a week, she does not feel like she can even get dressed. (R. 56). She testified that she cries every day. She hears things at night. (R. 53). She also states that she gets diarrhea, nausea, and headaches from the pain. (R. 54).

### Testimony of the Vocational Expert

At the hearing, the ALJ posed two hypothetical questions to the Vocational Expert, Edmund Calandra, to whose expert qualifications plaintiff stipulated. First, the expert was asked to assume the following facts: a claimant the same age, with the same educational and vocational background as plaintiff, who had the residual functional capacity to do light work which would allow flexibility in changing her position in the work day, in terms of a stand/sit option, and who further that she had additional non-exertional limitations secondary to psychiatric problems resulting in the following degrees of restrictions—with regard to daily living, a slight degree of impairment; with regard to difficulties in maintaining social functioning, a slight degree of impairment; with regard to abilities of concentration, persistence, and pace, occasional difficulties; and one historical episode of deterioration or decompensation. The ALJ then asked the vocational expert whether that claimant could return to plaintiff's assembly job, which the expert had testified as unskilled and requiring physical exertion at a seden-

tary to light level. The expert testified that, in his opinion, she could return to the assembly job. (R. 57–58).

The second hypothetical posed by the ALJ to the expert asked him to assume that the hypothetical claimant was the same age as plaintiff and had the same vocational and educational background and further assumed that the claimant experienced all of the subjective complaints, including those of pain and the emotional complaints as was testified to by plaintiff. The ALJ then asked whether in the expert's opinion that claimant could perform plaintiff's past relevant work and, if not, whether there would be any other jobs that would be vocationally appropriate. The expert testified "no" as to both questions. (R. 58).

### The ALJ's Findings

After consideration of the record and testimony at the hearing, the Administrative Law Judge made the following findings:

1. The claimant has not engaged in substantial activity since October 4, 1994.

2. The medical evidence establishes that the claimant has a non-severe back disorder, and major depression (single episode), but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant's allegations regarding the limitations caused by her impairments are not found to be credible to the degree alleged.

4. The claimant has the residual/functional capacity to perform light work with a sit/stand option; and her slight

degree of psychiatric impairment does not preclude return to past relevant work as an assembler (20 C.F.R. § 416.945).

5. The claimant's past relevant work as an assembler did not require the performance of work-related activities precluded by the above limitation(s) ( 20 C.F.R. § 416.965).

6. The claimant's impairments do not prevent the claimant from performing her past relevant work as an assembler.

8. [sic] The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. § 416.920(e)).

(R. 19–20). The ALJ also completed an OHA Psychiatric Review Technique Form for purposes of assessing her residual functional capacity, since her mental impairment did not meet any of the listings, and concluded that her affective disorder and mild depression would result in no more than a slight difficulty in daily activities and social functioning and seldom would cause difficulty with concentration. (R. 21–23).

### DISCUSSION

#### Determining "Disability" under the Social Security Act

Under the Social Security Act, in order to qualify for SSI, an individual must be disabled, as that term is defined by the Act.[5] "Disability" is defined as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *see Rosa v. Callahan,* 168 F.3d 72 (2d Cir. 1999).[6] Further, "[a]n individual shall be

---

5. In addition to being afflicted with a "disability," as defined by the statute, eligibility for SSI benefits requires that the applicant have limited financial resources not exceeding an amount defined by the statute. *See* 42 U.S.C. § 1382(a). In this case, there is no dispute as to plaintiff's financial eligibility for SSI benefits.

6. The statute defines a "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D),

determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B); *see Bush v. Shalala,* 94 F.3d 40, 45 n. 3 (2d Cir.1996).

The Social Security Administration has promulgated a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 416.920; *see Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). First, the ALJ must determine whether the claimant is currently working. 20 C.F.R. §§ 416.920(b), 416.925. If the claimant is currently employed, the claim is disallowed. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. 20 C.F.R. § 416.920(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations (the "listings"). 20 C.F.R. § 416.920(d); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant's impairment meets or equals one of the impairments in the listings, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(d); *see Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his past relevant work. 20 C.F.R. § 416.920(e). If the claimant cannot perform his former work, the burden then shifts to the Commissioner to show that there is other work which the claimant could perform. *Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998). A claimant

is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. 20 C.F.R. § 416.920(f). The ALJ in this case found that plaintiff failed to establish that she could not perform her past relevant work and, therefore, he did not reach the fifth step in the determination process.

### The Parties' Contentions

In this case, plaintiff contends that the decision of the Commissioner is inconsistent with the evidence in two key areas. First, the limitation of light work is inconsistent with the record, which contains objective medical evidence supported by plaintiff's testimony of pain and postural limitations that preclude light or sedentary work. Second, the Commissioner's evaluation of plaintiff's mental illness is unsupported or inconsistent with the evidence, which showed plaintiff's treatment for depression with psychotic features, and which is a nonexertional impairment with more than a slight impact on the plaintiff, according to her treating physicians. Therefore, plaintiff contends that the Commissioner's conclusion that plaintiff's capacity to perform work activities is not significantly compromised by nonexertional impairments is unsupported.

Defendant, on the other hand, argues that there is substantial evidence in the record to support the Commissioner's decision that plaintiff, who had the burden of proof, failed to establish that she was under a disability within the meaning of the Act, since she failed to prove that she could not perform her past relevant work.

### Analysis

■ After consideration of the record as a whole, we find substantial evidence to support the Commissioner's findings that plaintiff did not a have a severe back disorder that would prevent her from performing her past relevant work and that her capacity to perform work activities was not significantly compromised by her nonexertional impairments.

The medical records indicate that, since 1991, plaintiff has had a history of low back pain. The medical records (and, indeed, plaintiff's own testimony) contain conflicting histories as to the date of onset and precipitating events, if any. One of the first entries by Dr. Nunes, indicates "no history of trauma." Other records indicate numerous falls on the ice or in the street. A CT Scan confirmed the existence of a bulging disc, although a subsequent MRI indicated no evidence of disc herniation or spinal stenosis. However, even after plaintiff's initial diagnosis, plaintiff was described as very active. The medical records repeatedly note improvement in plaintiff's back condition with Motrin and physical therapy. The doctors describe plaintiff's condition as "mild." Plaintiff's gait is described as normal, and her range of motion and strength in her lower extremities was also normal. Moreover, no treating or examining physician ever expressed an opinion that plaintiff was disabled. Indeed, the functional capacity assessment performed that in January, 1995, indicated that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, and could stand or walk 6 hours out of an 8–hour workday, and that she could push and pull an unlimited amount, which would allow her to perform light work.[7] In 1995, at her mental disability determination, plaintiff stated that she attempted to attend to all the household chores with frequent rest intervals.

Thus, although there was objective medical evidence supporting the existence of lower back problems, that medical evidence does not in and of itself establish disability. The fact that irregularities showed up on a CT Scan does not establish that she was prevented from engaging in *any* substantial gainful activity by virtue of this impairment. *See Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir.1983). Moreover, plaintiff's statements about her pain or other symptoms alone are not enough to establish a physical impairment. *See* 20 C.F.R. § 416.929(a). The ALJ considered plaintiff's complaints of pain in light of her testimony concerning (1) her daily activities, (2) the location, duration, frequency, and intensity of the pain and other symptoms, (3) precipitating and aggravating factors, (4) the type, dosage, and effectiveness and side effects of any medication that the plaintiff takes or has taken to alleviate the pain or other symptoms, (5) treatment, other than medication, that plaintiff receives or has received for relief of pain and other symptoms, (6) any measures that the plaintiff uses or has used to relieve pain or other symptoms (such as lying down or standing periodically), and (7) other factors concerning the plaintiff's functional limitations and restrictions due to pain and other symptoms. *See* 20 C.F.R. § 416.929(c)(3). There is substantial evidence in the record to support the ALJ's finding that plaintiff's activities of daily living (such as her ability to attend to all household chores independently albeit with frequent rest intervals and to care for her children), as well as her lack of effort in seeking appropriate treatment for her pain (such as her failure to continue with physical therapy despite its beneficial results) and the types and dosages of medication taken (references in the medical records that Motrin improved her back condition [8] and statements that her back

7. "Light work" is defined by the regulations as work that:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of per-

> forming a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

8. Although plaintiff testified before the ALJ that the medicine prescribed by Dr. Nunes

problems were improving), contradicted her testimony at the hearing concerning the degree of disabling pain she claimed to experience. We have also noted that plaintiff's subjective complaints to her treating physicians were substantially less than her complaints to the doctors performing the disability examination. Thus, we hold that the ALJ's finding that her complaints were not entirely credible was supported by substantial evidence in the record.

■ Plaintiff also claims that the ALJ ignored the impact of her psychological impairments on her ability to work. But, the evidence indicates that other than one episode of major depression, her psychological problems caused only "slight" restrictions on her daily living activities and her ability to function socially, that they "often" caused difficulty with her ability to concentrate, and that none of these functional limitations were sufficiently severe to satisfy any of the listings for mental impairments. (*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.01–12.08). The records also indicate that her depression had increased in 1994 after her family came to visit from Puerto Rico and after the death of her husband, but it was anticipated that, with counseling and therapy, she should be able to eliminate her depression and decrease her anxiety within one year, or by early 1996. (*See* R. 315–17). By September, 1995, plaintiff was feeling better and, two months later, her medications were decreased. (R. 336–37). Thus, other than plaintiff's subjective complaints, the record does not support plaintiff's claim that her mental impairment was so severe as to significantly compromise her ability to work.

■ The ALJ's finding that plaintiff's residual functional capacity would allow her to perform her past work as an assembler was consistent with plaintiff's func-

tional assessment that showed that she retained the capacity to perform light work, and with her testimony concerning the requirements of her previous job. The Vocational Report indicates that plaintiff's prior job as an assembler required four hours of sitting and four hours of standing in an 8–hour day. It did not require lifting or carrying. (R. 275). The ALJ also received testimony from a vocational expert, who concluded that, assuming you discredit plaintiff's subjective complaints of pain, a hypothetical claimant with plaintiff's exertional and non-exertional impairments could perform plaintiff's past relevant work.[9] Other than plaintiff's own testimony concerning her subjective complaints, plaintiff failed to carry her burden of proving that she did not have the residual functional capacity to perform her past relevant work. We find that the ALJ's determination in this regard to be supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED, and, therefore, plaintiff's motion [Doc. # 9] is DENIED, and defendant's cross-motion [Doc. # 12] is GRANTED. The Clerk is directed to enter Judgment accordingly and to close the file.

SO ORDERED.

---

hardly worked at all (R. 44–45), there are several references in the medical records to the fact that the medication she was taking did in fact help her back pain. (R. 342, 343).

9. Because the ALJ decided this case at the fourth sequential step, he was not required to employ a vocational expert. 20 C.F.R. § 416.920.