**Debbie QUINONES o/b/o Jennifer QUINONES, Plaintiff–Appellant,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant–Appellee.**

**No. 1247, Docket 96–6207.**

United States Court of Appeals, Second Circuit.

Argued May 9, 1997.

Decided June 26, 1997.

James M. Baker, New York City (Cardozo Bet Tzedek Legal Services), for Plaintiff–Appellant.

Linda A. Riffkin, Assistant United States Attorney, New York City, Mary Jo White, United States Attorney for the Southern District of New York, New York City, for Defendant–Appellee.

Before: FEINBERG, CARDAMONE, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiff Debbie Quinones ("Quinones") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), challenging the final determination of the Commissioner of Social Security (the "Commissioner") that

her daughter Jennifer Quinones ("Jennifer"), now thirteen years old, was not "disabled" and therefore was not entitled to Supplemental Security Income (SSI) benefits.

The Commissioner found that Jennifer suffered from a "less than moderate limitation ... in the area of concentration, persistence and pace" and that there was "no evidence of limitation in the domain[ ] of ... personal/behavioral development/ function." The United States District Court for the Southern District of New York (Peter K. Leisure, *Judge* ) affirmed. Because the Commissioner did not address substantial evidence of impairments in these areas, we reverse and remand.

*Background*

A. *Jennifer's Condition*

Jennifer was born on August 9, 1983, and suffers from both Hashimoto's thyroiditis and diabetes mellitus. She was diagnosed with diabetes when she was five. Jennifer takes oral medication once a day to control her thyroiditis. To treat her diabetes, Quinones gives Jennifer insulin injections and checks her blood sugar levels three times a day. When Jennifer's blood sugar level is too high, Quinones tests her urine for ketones. Jennifer makes quarterly visits to the Pediatric Endocrinology Department at Mount Sinai Medical Center, where doctors treat and monitor her condition.

Despite this treatment, Jennifer's diabetic condition is poorly controlled because she does not follow the appropriate dietary restrictions, and constantly "sneaks" inappropriate foods. As a result, her blood sugar levels remain high, increasing her hunger and thirst and affecting her concentration. Jennifer's uncontrolled condition also puts her at risk of blindness, renal failure, and/or the loss of limbs "in the near future."

Jennifer has twice been hospitalized in efforts to control her diabetes. After her first hospitalization in the spring of 1994, her treating physicians increased her daily dosage of insulin from two to the present three injections of insulin. When this dosage proved ineffective, Jennifer was admitted to the Cumberland Hospital for Children and Adolescents in New Kent, Virginia. She re-

mained there from May 16, 1995 to September 1, 1995, participating in a highly structured program involving physical therapy, nutritional counseling, and remedial education. Jennifer's stay at Cumberland did not bring her blood sugar levels under control; despite the controlled setting and regular counseling, she gained 10.5 pounds and continued to find prohibited foods.

Jennifer also has a severe learning disorder. Although I.Q. tests reveal average intelligence, she has done poorly in school. In second grade, she could not recognize many letters and was essentially unable to read. In the middle of the fourth grade, having already repeated the second grade, her reading abilities were still at a first grade level. Although the precise nature of her learning disorder is unclear, it appears to result from an "auditory short term memory and sequencing deficit," which makes it difficult for her to process information.

Despite her various difficulties, Jennifer is apparently alert and friendly. She plays sports and other games, has friends and good social skills, and treats her teachers with respect. She is fluent in spoken English and her examining psychologists describe her as bright, attentive, and eager to please. She attends regular classes and also receives additional instruction at the "resource room" of her school.

B. *Proceedings before the Commissioner*

After Jennifer was diagnosed with diabetes, her mother applied in 1989 for SSI benefits on her behalf, claiming disability on account of diabetes. The Commissioner denied the application in June of that year. Although Quinones did not appeal, the Commissioner reopened Jennifer's application as a result of the Supreme Court's decision in *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), which required the reevaluation of applications of children whose claims had been decided under an overly restrictive definition of disability.

Applying the new standard, the Commissioner denied Jennifer's claim on March 16, 1993, and reaffirmed this decision upon reconsideration. Quinones then requested a hearing before an administrative law judge

("ALJ"). On June 2, 1994, ALJ Louis V. Zamora heard testimony from Quinones and Jennifer. He also received into evidence reports from Jennifer's physicians, teachers, and counselors. After the hearing, Jennifer's attorney presented, and the ALJ accepted, more recent school reports.

On November 12, 1994, the ALJ ruled that Jennifer was not entitled to benefits. Applying the four-step evaluation process set forth in 20 C.F.R. § 416.924, the ALJ found that Jennifer was not engaged in substantial gainful activity and was suffering from a "severe" impairment, but that her impairment did not meet or equal a listed impairment. Thus, the ALJ conducted an "individualized functional assessment" to determine whether the Jennifer's impairment was "of comparable severity to that which would disable an adult."

Reviewing the relevant "domains," the ALJ found that Jennifer suffers from a marked impairment in the area of cognition because of her learning disability, and less than moderate limitations of "motor development" and "concentration, persistence, and pace." The ALJ found no evidence of limitations in the domains of communicative development, social development, and personal/behavioral development. In reaching these conclusions, the ALJ relied on various psychological evaluations and the reports of Jennifer's teachers. In particular, the ALJ focussed on comments in the record that Jennifer is "bright," "friendly," "responsive," "well-adjusted," and "cooperative"; and that she "likes to interact verbally with classmates," "attends regular classes," takes part in a variety of physical activities, and "does not have problems in how she acts around other people [or] ... in self-care activities." Noting that Jennifer's teachers found her to have "problems with concentration, persistence, and pace when attempting to perform simple/complex tasks," the ALJ nevertheless found that there was "no clear documentation of an inability to engage in an activity and to sustain the activity for a period of time and at a pace appropriate to her age."

Quinones sought review of the ALJ's ruling before the Appeals Council. In doing so, she submitted another teacher evaluation describing Jennifer's problems with concentration. In May 1995, the Appeals Council issued a notice declining to review the ALJ's decision. In June 1995, after the Appeals Court denied Quinones' motion for reconsideration on the basis of additional evidence, the ALJ's ruling became the Commissioner's final determination.

### C. Proceedings in the District Court

Mrs. Quinones then brought this action seeking to reverse the denial of benefits. She challenged the ALJ's findings that Jennifer suffered from a less than moderate impairment in the area of concentration, and no impairment at all with respect to personal/behavioral function. She argued that if Jennifer had at least a moderate impairment in either area, she was entitled to benefits under 20 C.F.R. § 416.924e(c)(2)(i).

Upon cross-motions for judgment on the pleadings, the district court affirmed the Commissioner's ruling and dismissed the complaint. The court found that "[t]he record is replete with evidence of a moderate impairment in Jennifer's concentration, persistence, and pace, as pertains to the area of reading." But the district court ruled that because the ALJ had already found Jennifer to have a marked impairment of cognition as a result of her reading problems, those problems could not form the basis for a finding that she suffered a moderate impairment in her concentration. The court explained its reasoning as follows:

[I]t is necessary to separate out a natural frustration, arising from a learning disorder, from a truly independent disability in the area of concentration. The distinction between the two must be maintained for the guidelines to be effective. Otherwise, any marked disability in the area of cognition would lead, almost automatically, to at least a moderate disability in the area of concentration. This would violate the intention of the regulations that a single marked disability is insufficient to qualify for benefits.

The district court found that the many concentration deficiencies reported by Jennifer's teachers all related to her frustration with reading, and that there was evidence that she

was able to concentrate on tasks that she enjoyed. For this reason, it held that the ALJ's finding with respect to Jennifer's concentration was supported by substantial evidence.

The district court also affirmed the ALJ's decision that there was no evidence of limitation in the domain of personal/behavioral function. The court observed that "[i]t may be true that Jennifer is not exhibiting an ideal level of cooperation with respect to her diet. In fact, her level of cooperation may be quite poor, and it may in fact be placing her at greater risk of very serious complications from her diabetes." But the court found that "[f]or an impairment to exist, Jennifer must be impaired with respect to other children her age" and that "[i]t is not at all clear that a typical girl of her age, with a similar medical condition, would behave substantially more responsibly in regulating her diet." In support of this conclusion, the court relied on a report, dated July 14, 1995, in which one of Jennifer's physicians stated that her failure to control her condition "is not necessarily inappropriate in view of her age." The court thus found that substantial evidence supported the ALJ's finding.

## Discussion

On appeal, Quinones challenges the Commissioner's findings with respect to Jennifer's concentration, persistence, and pace and her personal/behavioral function. She argues that the district court acknowledged that there was substantial evidence that Jennifer suffered from a concentration deficit, but disregarded this evidence because it erroneously interpreted the regulations in an overly restrictive manner. She also contends that the overwhelming evidence of Jennifer's inability to control her diet required a finding that she has at least a moderate impairment in the domain of personal/behavioral function.

### A. Standard of Review

The Secretary's determination that a person is not disabled is conclusive when supported by "substantial evidence." 42 U.S.C. § 405(g); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). The Supreme Court has defined substantial evidence as "more than a mere scintilla" and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

 We undertake a "plenary review" of the administrative record to determine whether substantial evidence supports the denial of benefits. *Pratts*, 94 F.3d at 37. In doing so, we focus on the administrative record rather than the district court's ruling. *Id.* Although we will not determine disability *de novo, id.,* we consider the whole record, examining the evidence from both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988).

### B. The Framework for Determining Childhood Disability

A child under the age of 18 is entitled to disability benefits if she suffers from a "medically determinable physical or mental impairment of comparable severity" to one that would disable an adult. 42 U.S.C. § 1382c(a)(3)(A) (1994).[1] The applicable regulations define a disability of "comparable severity" as one that "so limits [a child's] ability to function independently, appropriately, and effectively in an age-appropriate manner that" the resulting impairments and limitations "are comparable to those which would disable an adult." 20 C.F.R. § 416.924(a).

---

1. Effective August 22, 1996, Congress has amended the definition of childhood disability. Under the new provision, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.A. § 1382c(a)(3)(C)(i) (West Supp.1997). When this appeal was filed, the Commissioner had not yet promulgated regulations under this new provision. The Commissioner therefore agreed to "waive any argument regarding the applicability of the new childhood disability definition to this case with respect to the period ... prior to and including November 12, 1994." Appellee's Brief at 21 n.*.

To determine whether a child's impairment is of "comparable severity," *id.*, the Commissioner follows a four-step procedure. 20 C.F.R. § 416.924(b). The Commissioner first considers whether the child is engaged in "substantial gainful activity." *Id.* If the child is not engaged in such activity, the Commissioner must determine whether the child has an impairment or combination of impairments that is "severe." *Id.* If the child has a severe impairment, the Commissioner next considers whether the impairment "meets or equals in severity" any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* A determination that a child has a listed impairment that meets the durational requirements results in a finding of disability. 20 C.F.R. § 416.924(e). If the child has an unlisted but "severe" impairment, the Commissioner moves to the fourth step and conducts an "individualized functional assessment" ("IFA") to determine whether the impairment would disable an adult. 20 C.F.R. §§ 416.924(b) & (f).

The regulations provide that, in conducting an IFA for a child of Jennifer's age, the Commissioner may consider the effects of the child's impairment with respect to six "domains of development or functioning": cognition; communication; motor abilities; social abilities; personal/behavioral patterns; and concentration, persistence, and pace in task completion. 20 C.F.R. §§ 416.924d(c) & (h). Under the IFA regulations, the Commissioner "will generally find comparable severity" if a child of Jennifer's age is impaired to a marked degree in one domain, and to a moderate degree in at least one other domain; or if she is impaired to a moderate degree in at least three of the six domains. *See* 20 C.F.R. §§ 416.924e(c)(2)(i) & (ii). However, these regulations also make clear that "[e]ach case must be evaluated on its own merits using the principles and guidelines of all the regulations addressing childhood disability." 20 C.F.R. § 416.924e(c)(2).

### C. Assessment of the Commissioner's Findings

Quinones disputes the ALJ's findings that Jennifer suffers a less than moderate impairment in the domain of concentration, persistence, and pace and that she has no limitation in the domain of personal/behavioral function. Quinones contends that Jennifer suffers from at least a moderate impairment in each of these domains and that because the ALJ found a marked impairment in the cognitive domain, the regulations require a finding that Jennifer is disabled and entitled to benefits.

### 1. The Domain of Concentration, Persistence, and Pace

The regulations explain that this domain concerns a school-age child's "ability to engage in an activity, such as playing or reading, and to sustain the activity for a period of time and at a pace appropriate to [her] age." 20 C.F.R. § 416.924d(h)(6). The regulations suggest that a moderate impairment in this area would consist of a frequent inability "to complete age-appropriate complex tasks," and an occasional inability "to perform simple age-appropriate tasks adequately." 20 C.F.R. § 416.924e(c)(2)(ii).

The district court conceded that the "record is replete with evidence of a moderate impairment in Jennifer's concentration, persistence, and pace, as pertains to the area of reading." The district court also located additional evidence of lack of concentration in the reports of Jennifer's teachers and examining psychologists. But the district court dismissed all this evidence because it found that Jennifer's lack of concentration stemmed from her frustration with her inability to read. As already discussed, the district court believed that using evidence of lack of concentration related to Jennifer's learning disability in the evaluation of her concentration would amount to impermissible double counting. Eliminating that evidence from the equation, it found that the remaining evidence supported the ALJ's conclusion.

Quinones argues that the district court erred in disregarding the evidence of lack of concentration that related to reading. We agree. The regulations make clear that in conducting an individualized functional assessment, the ALJ should "consider how [the child's] impairment(s) in one domain affects [her] development or functioning in other domains." 20 C.F.R. § 416.924d(d)(1). As the Commissioner explained in an official comment in 1993, impairments in one domain

can affect a child's performance in other areas. *See* 58 Fed.Reg. 47,532, 47,558 (1993). Finally, we disagree with the district court's underlying assumption. The fact that a child has difficulty reading and learning does not necessarily mean that she will have problems with concentration. Some children who read and perform other academic tasks below age-appropriate levels are nevertheless able to focus and concentrate on their work. For these reasons, we believe that the district court disregarded evidence that it should have considered.

■ Taking this additional evidence into account, we find that the Commissioner's decision is not supported by substantial evidence. The ALJ based his assessment of Jennifer's concentration on her participation in regular classes and various recreational activities, and on the fact that there was "no clear documentation of an inability to engage in an activity and to sustain the activity for a period of time and at a pace appropriate to her age." The ALJ noted that teacher reports indicate "problems with concentration," but found that "other than reading problems, the reports seem to show an average eleven year old."

The record contains substantial evidence of concentration problems, related not only to reading. Kennedy Ramos, Jennifer's fourth grade homeroom teacher, reported that her inability to stay "on task" was constant, and noted her "constant" difficulty maintaining concentration on both simple and complex tasks, including mathematic problems, science projects, and social studies projects. Another "educational evaluator" reported that Jennifer in fourth grade was "easily distracted" and "ha[d] difficulty during transitions."

Jennifer's fourth grade teachers also observed problems in academic subjects other than reading. Ramos commented that "[s]he is not persistent when it comes to solving two or three step problems, in math, of the simple variety." Similarly, Jennifer's resource room teacher, Karen Kaladow, noted that she had difficulty completing long division problems "because she appears bored and cannot concentrate long enough to complete the necessary steps." Kaladow also wrote that Jennifer had "frequent" problems with concentration, persistence, and pace

when attempting to perform both simple and complex age-appropriate tasks.

Jennifer's fifth grade teacher also reported a very short attention span, difficulty remaining on task without direct supervision, and "lack of concentration during most academic activities, during the day." Dr. Rodman, a psychologist who examined Jennifer at Mt. Sinai in December 1990 and January 1991, and Dr. Steinberger, a school psychologist who examined her in 1994, both commented that Jennifer lost interest in activities they suggested and completed them only when pressed to do so.

Arguing that her decision was supported by substantial evidence, the Commissioner relies primarily on the reports of these psychologists. She points out that Dr. Rodman wrote that Jennifer was able to sustain her attention and work carefully on "tasks which she enjoyed." Dr. Rodman also observed that Jennifer "made a gallant effort to try" to complete tasks. Similarly, Dr. Steinberger found that during testing Jennifer was able to stay "on-task" and showed no "signs of impulsivity."

We think that the reports of the psychologists are at best inconclusive with respect to Jennifer's concentration, persistence, and pace. Standing against the reports of Jennifer's teachers, who dealt with her on a daily basis over at least a school year, these reports do not by themselves amount to "substantial evidence" supporting the Commissioner's finding.

The Commissioner also defends her decision by pointing to record evidence of Jennifer's intelligence, imagination, social skills, bright demeanor, and maturity. But these and other positive qualities to which the record attests are simply irrelevant to an evaluation of Jennifer's concentration, persistence, and pace. Finally, the Commissioner emphasizes Jennifer's ability to complete tasks that she enjoyed and homework that did not involve reading, as well as her ability to paint, swim, and play sports. Although these activities suggest that Jennifer is "sometimes" able to complete simple, age-appropriate tasks, they do not refute her teachers' testimony that Jennifer has "constant" difficulty in completing both simple and complex age-appropriate tasks.

■ Where an administrative record supports disparate findings, we must accept the ALJ's factual determinations. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir.1982). But the record in this case simply does not contain substantial evidence to support the finding that Jennifer's impairment in the domain of concentration, persistence, and pace is less than moderate.

### 2. The Domain of Personal/Behavioral Function

■ The regulations define the personal/behavioral function as a child's "ability to help [her]self and to cooperate with others in taking care of [her] personal needs and safety; to respond appropriately to authority and school rules; to manifest a sense of responsibility for [her]self and respect for others; to adapt to [her] environment; and to learn new skills." 20 C.F.R. § 416.924d(h)(5). Quinones argues that Jennifer has exhibited a total inability to control her diet, despite her understanding that in doing so she places herself at risk from complications of diabetes, including renal failure, blindness, and amputation of limbs. She contends that Jennifer's failure to adjust to her condition, despite repeated warnings and extreme measures (including hospitalization), amounts to at least a moderate impairment in the domain of personal/behavioral function.

In finding no impairment in this domain, the ALJ focussed on Jennifer's sociable nature, her friendly relations with her peers, and her respect for and cooperation with her teachers. The ALJ also commented that Mrs. Quinones had reported that Jennifer "does not have problems in self-care activities." Standing alone, this evidence might justify the ALJ's finding of that Jennifer has no impairment in this domain. Indeed, it suggests that she is a fairly well-adjusted child who respects authority, follows rules, and gets along with her peers.

But this evidence does not stand alone. Jennifer's absolute refusal (or inability) to control her diet suggests that she does suffer from at least a moderate impairment in her personal/behavioral function. Despite constant warnings that she is in danger of renal failure, blindness, and loss of limbs, Jennifer refuses to follow dietary restrictions. She constantly "sneaks" and steals food, even while hospitalized to receive treatment for her eating problems. Her three-month hospitalization appears to have had no effect on this problem. Thus, although Jennifer may otherwise be well-adjusted, her eating problem seems so out-of-control and so destructive to her health and well-being as to qualify independently as a moderate impairment.

Although the ALJ observed that Jennifer has "poor control of her diabetes mellitus because of her eating habits and her parents' failure to supervise her activities," he did not explicitly consider whether her eating problem might by itself constitute a moderate impairment of her personal/behavioral function. The district court minimized the significance of Jennifer's eating habits by suggesting, on the basis of one comment in a doctor's report, that her response to her diabetes was not unusual for a child of her age. We are less confident that Jennifer's self-destructive eating habit is typical of the behavior of diabetic children of her age. Some children of that age, when told that they risk blindness and amputation of limbs, might be able to control—or at least cooperate in controlling—their diets.

Although the most extreme episodes demonstrating Jennifer's inability to control her diet occurred in 1995 at the Cumberland Hospital program, after the ALJ had issued his ruling, the record before the ALJ contained significant evidence of Jennifer's dietary problems. We believe that this evidence alone might demonstrate a moderate impairment of Jennifer's personal/behavioral function. As the ALJ did not address this evidence, we think it best to remand the case so that he can consider in the first instance what weight to accord it.

### Conclusion

The Commissioner's decision with respect to Jennifer's concentration, persistence, and pace is not supported by substantial evidence. Her decision with respect to Jennifer's personal/behavioral function warrants reconsideration to take into account significant evidence that was not addressed at the administrative level.

Although the regulations suggest that a finding of one marked impairment and one

moderate impairment will usually result in a finding of disability, they stress that this is not an automatic conclusion. *See, e.g.,* 20 C.F.R. § 416.924e(a) ("The guidelines illustrate a level of impairment severity that is generally, though not invariably, sufficient to establish comparable severity"). For this reason, we decline to enter judgment in Jennifer's favor.

Instead, we remand the case to the ALJ with the instructions that Jennifer suffers from a moderate impairment in the domain of concentration, persistence and pace, and that he should consider, in light of her very serious eating problems, whether she also has a moderate impairment in the domain of personal/behavioral function. After making the appropriate findings, he should then decide whether Jennifer's impairments, taken together, amount to a qualifying disability.

The judgment of the district court is reversed and the action is remanded to the ALJ for proceedings consistent with this opinion.