**Kathleen PIZZO, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of Social Security, Defendant.**

**No. 03 Civ. 6647.**

United States District Court, S.D. New York.

July 20, 2004.

enrichment is dismissed as moot, and defendant's motion for summary judgment is denied in its entirety.

Fine, Olin & Anderson, LLP, New York City by Pamela Thomas, for Plaintiff.

David N. Kelley, Esq., United States Attorney for the Southern District of New York, by: Lorraine S. Novinski, Esq., Assistant United States Attorney, New York, NY, for Defendant.

## OPINION

CHIN, District Judge.

Plaintiff Kathleen Pizzo brings this action pursuant to 42 U.S.C. § 405(g), challenging the final determination of defendant Commissioner of the Social Security Administration (the "Commissioner") that plaintiff was not entitled to disability insurance benefits under the Social Security Act (the "Act"). Plaintiff moves for judgment on the pleadings, pursuant to Fed. R.Civ.P. 12(c). The Commissioner cross-moves for judgment on the pleadings. For the reasons set forth below, the Commissioner's determination is remanded for further administrative proceedings consistent with this decision. Plaintiff's motion is granted to the extent of the remand, and the Commissioner's cross-motion is denied.

## BACKGROUND

### A. Prior Proceedings

Plaintiff filed an initial Title II application for disability insurance benefits in August 1982 that was denied on November 22, 1982. (Tr. at 86, 106, 16). That application qualified for reopening under the *Stieberger* settlement.[1]

In March 1993, plaintiff requested review of the November 1982 denial. (*Id.* at 82). Six years later, in March 1999, the Social Security Administration (the "SSA") contacted plaintiff regarding her Title II *Stieberger* claim. (*Id.* at 76). The period of time under consideration began on March 27, 1989. (*Id.* at 82). Plaintiff's supplemental application was denied in August 1999. (*Id.* at 77). The denial was based on the SSA's determination that plaintiff was able to perform a wide range of light level work during the *Stieberger* period. (*Id.* at 78–79, 196–202).

Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") and on June 7, 2000, an administrative hearing was held before ALJ Kenneth Scheer. (*Id.* at 91–95, 122–23). Plaintiff, represented by counsel, appeared and testified at the hearing. (*Id.* at 26–64). On March 16, 2001, the ALJ denied

---

1. The *Stieberger* settlement "provide[d] for the reopening of SSA claims by class members meeting the following criteria: (a) The class member had a disability claim denied or terminated between October 1, 1981, and ... [July 2, 1992] on the ground that the class member was not, or was no longer, disabled ...; and (b) The class member was a New York State resident at the time of the denial or termination; and (c) The class member had a disability claim denied or terminated,

(i) at any level of administrative review between October 1, 1981 and October 17, 1985; or (ii) at the ALJ [Administrative Law Judge] or Appeals Council level between October 18, 1985 and [July 2, 1992], inclusive." *Hairston v. Commissioner of Social Security*, 03 Civ. 3781, 2004 WL 253288, *2, 2004 U.S. Dist. LEXIS 1846, at *4 (S.D.N.Y. Feb. 10, 2004) (citing *Stieberger v. Sullivan*, 801 F.Supp. 1079, 1086 (S.D.N.Y.1992)).

the application, finding that plaintiff had not been disabled at any relevant time. (*Id.* at 16–22). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on July 19, 2003. (*Id.* at 4–6). This action followed.

## B. *The Evidence*

### 1. *Plaintiff's Age, Education, and Experience*

Plaintiff was born on January 10, 1953 and was 48 years old at the time of the March 16, 2001, ALJ decision. (*Id.* at 38). Her onset date of disability was February 9, 1981, and she had not worked since March 1981. (*Id.* at 16, 31, 41).

Plaintiff completed twelve years of school and worked for various employers as a secretary/typist prior to 1979. (*Id.* at 39, 118). From 1979 until 1981 plaintiff worked for Mobil Oil Co., first preparing manuals and in the mail room and later as a record/file clerk. (*Id.*). According to plaintiff's testimony at the hearing on March 16, 2001, her job as a record clerk required her to fill large cartons with files and place them in the center of the room. (*Id.* at 40–41).

Plaintiff discontinued working in 1981 when she slipped and fell after exiting an elevator at her place of employment. (*Id.* at 30–31, 41–43). At the time of the hearing on June 7, 2000, plaintiff was living with her sister. (*Id.* at 38). Plaintiff testified that she did not do any of the food shopping because she could not lift anything. (*Id.* at 48). Her daily activities included watching television and reading. (*Id.* at 47–48). According to plaintiff, she had driven only a few blocks in the month before the hearing and could drive the car straight but had difficulty turning. (*Id.* at 39). She did not use public transportation. (*Id.*). Additionally, plaintiff took occasional trips to a relative's home at the New Jersey Shore. (*Id.* at 47).

### 2. *Medical Evidence*

### a. *Treating Physicians*

### i. *Dr. Richard Memoli*

In March 1981, plaintiff was treated for severe pain in the emergency room of Westchester Square Hospital by Dr. Richard Memoli. (*Id.* at 42–43). Since March 1981, plaintiff has received her medical treatment from Dr. Memoli for her work-related injuries. (*Id.* at 31, 108). The record, however, does not contain any treatment records or progress notes from Dr. Memoli. The record only contains for this period the forms that he submitted to the Workers' Compensation Board, prescription receipts, and a Medical Assessment of Ability to do Work–Related Activities form. (*See id.* at 128–74, 176–82, 184–92, 216–18, 219–32).

Documentation of plaintiff's emergency room visit is not in the record, but the record does contain a form filled out by Dr. Memoli based on an examination of plaintiff on May 8, 1981. (*Id.* at 192). Dr. Memoli's diagnoses included cervical spine sprain with right radiculopathy, lumbosacral spine sprain, paraspinal muscle spasm, pain and weakness of the dominant right arm and hand, and restricted range of motion. (*Id.* at 128–74, 176–82, 184–92, 216–18, 219–31). Treatment rendered and planned future treatment mostly included examination, home traction, keeping plaintiff off duty, and medication. (*Id.*). In July 1992 Dr. Memoli added that he was requesting hospitalization and traction, along with a cervical collar. (*Id.* at 159). From August 1992 to May 1995, Dr. Memoli also recommended that plaintiff use hot packs for her neck. (*Id.* at 145–54). In October 1996, January 1997, February 2000, and April 2000, Dr. Memoli noted "positive physical findings" (*Id.* at 137, 139, 229, 231).

Dr. Memoli classified plaintiff as being totally disabled from June 1981 through February 1993, and later classified plaintiff as partially disabled from June 1993 through April 2000. (*See id.* at 155–82, 128–54, 184–92, 219–31). There was no explanation for this change of classification. (*Id.*). In December 1998, Dr. Memoli reported that plaintiff used a splint on her right wrist. (*Id.* at 128). There is no explanation of the need for this treatment in his documentation. (*Id.*).

Dr. Memoli referred plaintiff for EMG and nerve conduction tests in June 1981. (*Id.* at 175, 191). The results of these tests, however, are not in the record. (*Id.* at 46). Dr. Memoli also referred plaintiff for physical therapy sessions starting in September 1999. (*Id.* at 206). Further, Dr. Memoli prescribed various medications beginning in 1981 including Carisoprodol (Soma) and Elavil for muscle spasm and Tylenol with Codeine for pain. (*Id.* at 116). Beginning in 1995 Dr. Memoli prescribed Hydroconone/APAP (Vicodin) for plaintiff's pain. (*Id.*). Plaintiff took all of these medications on a daily basis. (*Id.*).

At the ALJ hearing, plaintiff submitted a Medical Assessment form completed by Dr. Memoli on June 6, 2000. (*Id.* at 216–18). Dr. Memoli estimated that in a regular work setting, plaintiff could occasionally lift and/or carry a maximum of 5 to 10 pounds. (*Id.* at 216). Dr. Memoli also reported that plaintiff could only stand up to 1 hour, because standing could increase spinal pressure. (*Id.* at 216–17). Further, plaintiff could only sit for up to 2 hours because prolonged sitting could cause increased stiffness. (*Id.* at 217). The basis of this assessment was Dr. Memoli's diagnosis of cervical spine radiculopathy and a chronic cervical sprain. (*Id.* at 216). He added that plaintiff had persistent pain in her neck, radiating pain down her arms, restricted range of motion, tenderness, and spasm. (*Id.*). Dr. Memoli also reported that plaintiff could not lift or carry without pain, could not stoop, kneel, crouch, or crawl, and could only climb stairs as needed. (*Id.* at 216, 217). Dr. Memoli characterized plaintiff as totally disabled. (*Id.* at 218). He reported that plaintiff required ongoing care, medication, and use of a cervical collar, pillow, and splint. (*Id.*).

### ii. *Dr. Elias Savitsky*

On April 8, 1981, plaintiff was evaluated by a psychiatrist, Dr. Elias Savitsky. (*Id.* at 33, 193–95). According to Dr. Savitsky, plaintiff suffered from persistent post traumatic pain syndrome, characterized by anxiety and depression. (*Id.* at 194). He reported that her personality characteristics sometimes caused predisposition to somatization of feelings of tension. (*Id.*). Dr. Savitsky recommended continued orthopedic care and antidepressant medications, with systematic counseling as an option if she failed to make clinical progress. (*Id.* at 195). His diagnosis was anxiety reaction, depressive features, post traumatic, and he reported a continued disability, causally related. (*Id.*).

Dr. Savitsky reexamined plaintiff on August 3, 1983. (*Id.* at 183). Plaintiff reported that that her condition was relatively static, and she felt she was getting "worse." (*Id.*). She complained of persistent pain syndrome involving the neck, especially on turning, prolonged sitting, and traveling. (*Id.*). Radiation to spine and back were also noted, along with numbness and weakness of the right arm along with a sense of pressure in the low back. (*Id.*). There were no gross disturbances in plaintiff's sleep, appetite, digestion, and no undue intake of tobacco, alcohol, or drugs. (*Id.*).

Further, Dr. Savitsky reported a high level of persistent anxiety and depressive moods, especially when plaintiff was in pain. (*Id.*). He noted that plaintiff contin-

ued to ruminate about her situation. (*Id.*). Dr. Savitsky also found no gross impairment of memory or capacity for concentration. (*Id.*). Dr. Savitsky reported that plaintiff continued to show a relatively static clinical course with anxiety and many somatic features. (*Id.*). He affirmed his prior recommendations for treatment and if there were no response in three months, he advised systematic psychiatric treatment because of the significant psychoneurotic aspect to her symptoms. (*Id.*).

### iii. Dr. Barbara Colon

In January 1986, plaintiff was examined by Dr. Barbara Colon, a physician employed by the Workers' Compensation Board (the "WCB"). (*Id.* at 175). In her Report of Medical Examination, Dr. Colon noted that plaintiff complained of constant pains across the back and neck; numbness of both hands, especially the right; difficulty sitting, walking, standing, and lying down; and limited motion of the neck. (*Id.*).

Plaintiff removed her cervical collar for examination of her neck by Dr. Colon, who found tenderness throughout the cervical spine with marked limitation of all motions of the neck. (*Id.*). Dr. Colon also reported tenderness across the upper back and limitation of motions of the right shoulder joint due to neck and upper back pains. (*Id.*). Dr. Colon reported that plaintiff walked slowly and had difficulty dressing, undressing, and getting on and off the examining table. (*Id.*).

Additionally, Dr. Colon found tenderness to palpation of the lumbar muscles and the lumbar spine. (*Id.*). Motions of the trunk were markedly restricted due to pain, and straight leg raising bilaterally was markedly limited. (*Id.*). Plaintiff could not lie with the knees extended and flexion of the hips in supine could not be done because of pain. (*Id.*). Dr. Colon found no quadri-ceps inequality and the reflexes were all difficult to obtain. (*Id.*). She classified plaintiff for the WCB as having a permanent partial disability. (*Id.*).

### iv. Dr. Jeff Levy

Plaintiff was seen several times by Dr. Jeff Levy beginning in March 1999. (*Id.* at 235–42). She consistently complained of frequent and painful urination. (*See id.* 235–40.). She also reported low back pain and pain in the right side of the back, right ear, leg, and right lower quadrant. (*Id.* at 236, 238, 239). There is no evidence that plaintiff ever reported any difficulty with her neck or wrists to Dr. Levy. (*Id.* at 235–42). A thyroid function test was normal, and an ultrasound study of the thyroid revealed tiny nodules and cystic changes. (*Id.* at 240, 243–44). At her hearing before the ALJ, plaintiff explained that these tests were performed because the MRI of her cervical spine had revealed an abnormality in the thyroid. (*Id.* at 55). At that time she was still undergoing further evaluation of this condition. (*Id.* at 57).

### b. Consulting Physicians

### i. Dr. Antero Sarreal

On August 3, 2000, consulting physician Dr. Antero Sarreal performed a thirty-minute orthopedic examination on plaintiff. (*Id.* at 277–81). Dr. Sarreal noted that since her accident in February 1981, plaintiff had complained of pain in the neck and low back, and had been depressed since that time. (*Id.* at 277). Plaintiff reported a history of injury on the left knee when she fell from a bicycle when she was eighteen, for which she underwent an operation. (*Id.* at 277, 278). Plaintiff also had a history of hypertension, not on medication, being followed up on thyroid condition, mass was noted, and planned biopsy of the thyroid gland. (*Id.*). She wore a splint on her right hand which she said she had

been doing for three years based on a diagnosis of carpal tunnel syndrome. (*Id.* at 277). She also used a soft cervical collar. (*Id.*)

Plaintiff reported a strong, pulling pain in her neck radiating to both upper extremities and to her hands, the right more than the left. (*Id.*). She complained of tingling sensations in the right hand fingers, tenderness on the right wrist and diminished sensation in her left hand finger. (*Id.*). She also reported anterior/inferior pain in her left knee for the past six years, aggravated by sitting. (*Id.*). Plaintiff said she had to change position to relieve pressure in her left foot. (*Id.*). She also complained of right knee pain. (*Id.*). Dr. Sarreal reported tenderness and swelling of the bilateral ankle with numbness of the bilateral big toe and bilateral second toe. (*Id.*). Additionally, plaintiff had back pain with tenderness at the L5 spinous process described as pulling in character, radiating upward to the thoracodorsal musculature, and her back pain radiated to the bilateral posterior thigh and bilateral posterior leg. (*Id.*). Plaintiff reported that she was able to walk a limited distance of one block, and was limited in standing and sitting and needed to shift and change position after a couple of minutes. (*Id.* at 278).

On examination, plaintiff was four feet eleven inches tall and weighed 234 pounds. (*Id.*). She walked slowly with a slightly limping gait avoiding pressure on the back and bilateral knee. (*Id.*). Dr. Sarreal noted that plaintiff needed assistance with her shoes and socks, and could get up from the chair slowly with some difficulty, could get on the examining table with some difficulty, and had difficulty getting up from the table to sitting position. (*Id.*). Holding and standing on the heels and toes caused left knee and back pain, and she had difficulty ambulating on her heels and toes. (*Id.*). Plaintiff could squat slowly with 1/3

range guarded, complaining of pain in the low back and bilateral knee. (*Id.*). Dr. Sarreal reported that plaintiff's bilateral shoulder at the end of slow full range motion caused discomfort to the bilateral trapezius musculature, and that her bilateral elbow and bilateral forearm supination/pronation and left wrist had a full range of motion. (*Id.*). Plaintiff's right wrist had pain at the end of a slow full range of motion. (*Id.*).

Dr. Sarreal found weakness in plaintiff's right hand grasp (4/5) with diminished sensation to touch on the right lateral posterior arm, right lateral posterior forearm and right third finger. (*Id.*). The Tinel sign procedure caused pain to the right elbow, and the left Tinel sign procedure caused pain to the left elbow and pain was felt in plaintiff's shoulder. (*Id.*). Plaintiff had good control and coordination throughout both upper extremities, and her biceps, triceps reflexes were present and equal (2+). (*Id.*). There was no sensation impairment to touch on the left upper extremity. (*Id.*). Plaintiff's bilateral hand had good dexterity and manipulation including grasping, handling, releasing, and fingering objects, and there was no finger joint contracture deformity. (*Id.*).

Dr. Sarreal also reported cervical spine bilateral side cervical paravertebral musculature tenderness and spasm, left more than right, tenderness on pressure on the posterior neck, neck movement done slowly guarded, and pain at the end of neck motion. (*Id.* at 278–79). Flexion was to 24 degrees, extension to 30 degrees, rotation 24 degrees in each direction, and lateral flexion to the right and left were both 30 degrees. (*Id.* at 279). Dr. Sarreal reported that in plaintiff's lumbar spine there was spinous process tenderness of the lumbar vertebrae, trunk movement was done slowly guarded, and there was flexion to 50 degrees, extension to 18 de-

grees, and lateral flexion to the right and left were both 18 degrees. (*Id.*). Straight leg raising while in a supine position produced discomfort at 40 degrees causing right knee pain, while in a sitting position straight leg raising was negative. (*Id.*).

Additionally, plaintiff's bilateral hips had a full range of motion. (*Id.*). Slow full extension of her right knee caused pain to the right anterior/inferior knee area, and flexion to 90 degrees. (*Id.*). Left lateral and medial leg pressure caused pain to the left knee. (*Id.*). Plaintiff's ankle had a full range of motion, and her muscle grade was 5/5. (*Id.*). Left ankle full range of motion caused discomfort to the left calf. (*Id.*). The left thigh was one inch smaller than the right and the right leg was 3/4 of an inch smaller than the left. (*Id.*). Plaintiff had a hyperactive bilateral patella and bilateral Achilles reflex. (*Id.*). There was diminished sensation to touch on the left lateral thigh, left lateral leg, and the left third, fourth and fifth toes. (*Id.*). Dr. Sarreal found no sensation impairment to touch on the right lower extremity. (*Id.*). Both lower extremities had good control and coordination. (*Id.*). Plaintiff's bilateral posterior tibial artery pulsations were weak, and her bilateral dorsalis pedis pulsation was good. (*Id.*).

An x-ray of the lumbosacral spine revealed only minimal degenerative changes. (*Id.* at 279, 281). An x-ray of the left knee revealed moderate degenerative changes and evidence compatible with Calcium Paraphosphate Deposition Disease ("CPPD Disease"). (*Id.*). Dr. Sarreal explained that CPPD Disease is also referred to as pseudo-gout. (*Id.* at 287). No x-ray of plaintiff's cervical spine was taken.

Dr. Sarreal's diagnosis was status-post left knee operation, history of right carpal tunnel syndrome, neck pain with radiculopathy right upper extremity, low back pain with radiculopathy left lower extremity with atrophy of the left thigh and right leg musculature, history of thyroid disorder, and history of depression. (*Id.* at 279).

In Dr. Sarreal's opinion, plaintiff's functional capacity to perform work-related activities was limited with respect to lifting and carrying heavy objects, pushing and pulling, prolonged standing and long distance ambulation. (*Id.* at 280). Dr. Sarreal reported that due to a history of depression there was emotional and mental involvement. (*Id.*). Despite the weakness of plaintiff's right hand grasp (4/5) with a history of right carpal tunnel syndrome, he reported that she had good bilateral hand dexterity and manipulation including grasping, releasing, handling and fingering objects. (*Id.*). He added that there was frequent limitation in squatting, crouching, bending and climbing, and occasional limitation in prolonged sitting and stooping, and minimal limitation in balancing. (*Id.*).

Dr. Sarreal's prognosis was guarded, and he recommended a follow-up by plaintiff's attending physician along with analgesic necessary to relieve the pain. (*Id.*). He also recommended conditioning and strengthening exercises of the trunk and upper and lower extremities to increase trunk flexibility and to prevent muscle atrophy and joint contracture deformity. (*Id.*).

According to plaintiff's interrogatories, in response to the question of whether there was any evidence that plaintiff was "faking," Dr. Sarreal wrote "Removal of claimant [sic] shoes and socks assisted by me during the evaluation." (*Id.* at 289). Also in plaintiff's interrogatories Dr. Sarreal answered "yes" to the question of whether he thought a treating orthopedic surgeon that has managed the patient's orthopedic conditions since 1981 was in a better position to assess a patient's condition and physical residual capacity. (*Id.* at 290).

### c. Other Evidence

#### i. Physical Residual Functional Capacity Assessment Forms

Two Physical Residual Functional Capacity ("RFC") Assessments of plaintiff were conducted. (*See id.* at 196–202, 270–76.). On the assessment form dated August 17, 1999, the medical consultant reported that plaintiff could occasionally lift and/or carry a maximum of 20 or 50 pounds, and could frequently lift and/or carry up to 25 pounds. (*Id.* at 197). Plaintiff could stand and/or walk with normal breaks for a total of at least 2 hours in an 8 hour workday, and could sit with normal breaks for a total of about 6 hours in an 8 hour workday. (*Id.*). Plaintiff's ability to push and/or pull, including operation of hand and/or foot controls, was unlimited, other than as shown for lift and/or carry. (*Id.*). Plaintiff was found to occasionally be able to climb, balance, stoop, kneel, crouch, and crawl. (*Id.* at 198). This assessment was based on the injury to plaintiff's cervical spine. (*Id.* at 197–98). No manipulative, visual, communicative, or environmental limitations were established. (*Id.* at 200–01). There were no treating source statements regarding plaintiff's physical capacities in file. (*Id.* at 201).

On another undated RFC assessment form, the medical consultant found that plaintiff could occasionally lift/and or carry up to 20 pounds, and could frequently lift and/or carry up to 10 pounds. (*Id.* at 271). She could stand and/or walk with normal breaks for about 6 hours in an 8 hour workday, and could sit with normal breaks for about 6 hours in an 8 hour workday. (*Id.*). Plaintiff's ability to push and/or pull was limited in both the upper and lower extremities to flexion to 20 degrees. (*Id.* at 271). This assessment was based evidence of plaintiff's neck pain, low back pain, and left lower extremity with atrophy of left thigh. (*Id.* at 271). Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and she had no manipulative, visual, communicative, or environmental limitations. (*Id.* at 273–74).

The medical consultant reported that there were treating source statements regarding plaintiff's physical capacities in file, and the medical consultant's conclusions about plaintiff's limitations were not significantly different from the treating source's findings. (*Id.* at 276).

#### ii. MRI

The MRI of plaintiff's cervical spine was ordered by Dr. Memoli and performed on September 13, 1999. (*Id.* at 245). The MRI revealed normal alignment, with no fractures or destructive lesions. (*Id.* at 245). There was reverse of the normal cervical curve suggesting muscle spasm, and degenerative disease with hypertrophic spur formation. (*Id.*). There were anterior and posterior osteophytes seen throughout the cervical region. (*Id.*). The MRI also yielded evidence of posterior protrusion of the disc material at C3–C4, C4–C5 and C5–C6 in the midline which impressed on the thecal sac with the appearance of central disc bulges. (*Id.*). No cord compression or spinal stenosis was found, and the lateral recesses and nerve roots were unremarkable. (*Id.*). The cervical spinal cord showed no mass or syrinx, and the craniovertebral junction was unremarkable. (*Id.*). There was suspicion of enlargement of the right lobe of the thyroid and clinical correlation was suggested. (*Id.*).

The overall impression from the MRI was muscle spasm, mild degenerative disease, central disc bulge at C3–C4, C4–C5, and C5–C6, and suspicion of an enlargement of the right lobe of the thyroid with a nodular density within it. (*Id.*). Further clinical evaluation was recommended. (*Id.*).

### iii. *Physical Therapy Sessions*

Also on September 13, 1999, pursuant to Dr. Memoli's referral, plaintiff began a program of physical therapy to increase ROM, decrease pain, and improve function. (*Id.* at 206). Plaintiff was scheduled for two sessions a week for six to eight weeks, and her treatment included moist heat/ice, electric stimulation, ultrasound, and isometric, isotonic, range or motion, and postural exercise. (*Id.*). The record reflects only six sessions of therapy. (*See Id.* at 207–15). Plaintiff's last recorded physical therapy session was on October 13, 1999. (*Id.* at 215).

### iv. *Plaintiff's Testimonial Evidence*

Plaintiff testified at the June 2000 hearing before the ALJ that she had pain in her neck that went down her back into the spine, and she could not turn. (*Id.* at 45). She testified that the pain made her arms numb, that she would lose control if she held anything, and when she would lie down pain would shoot across her chest. (*Id.*). Additionally, plaintiff testified that she had constant pain and spasms in her back, and that she had difficulty bending, sitting, and lying. (*Id.*). Plaintiff also stated that she could only walk to her porch before having to stop because of arthritis in her knees. (*Id.* at 48–50). She said she could sit for 15 minutes before having a problem, and could only stand for a while before her legs and back began to hurt. (*Id.* at 50). Plaintiff testified that she could only lift up to 5 pounds. (*Id.*). Plaintiff also testified that she was taking painkillers, muscle relaxers, and Tylenol, which caused memory loss, mood swings, and general side effects. (*Id.* at 53). Earlier in the hearing, however, plaintiff stated that she had a good memory. (*Id.* at 33). She stated that she could only sleep for an hour or two before she was awoken by pain in her neck, back, and legs.

When asked by the ALJ about a brace on her right hand, plaintiff explained that she had "the beginning of carpal tunnel," and that she would be receiving a brace for her other hand by Dr. Memoli. (*Id.* at 46). Plaintiff also told the ALJ she was receiving treatment for thyroid disease, which was not related to her orthopedic problems. (*Id.* at 54–55). Additionally, plaintiff recalled that doctors representing Mobile Oil had conducted independent medical examinations ("IME's") of her after her injury, but the IME's are not present in the record. (*Id.* at 31–32, 49).

## DISCUSSION

### A. *Applicable Law*

#### 1. *Standard of Review*

A court may set aside the Commissioner's decision to deny disability benefits only when it is based on legal error or is not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir.1998). Substantial evidence means "more than a mere scintilla"—it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir.1997) (internal quotations and citations omitted). A district court's review of the Commissioner's determination is therefore limited to "whether the Commissioner applied the proper legal standards, whether its factual findings were supported by substantial evidence, and whether [he] provided a full and fair hearing." *Saul v. Apfel*, No. 97 Civ. 1616(DC), 1998 WL 329275, at *3 (S.D.N.Y. June 22, 1998). The Commissioner's decision is to be afforded considerable deference; the reviewing court should not " 'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.' " *Jones v. Sulli-*

*van*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

## 2. *Disability Determination*

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of such severity that the claimant

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* at § 423(d)(2)(A). If a claimant is engaged in substantial gainful activity, however, he will be found "not disabled regardless of [his] medical condition or [his] age, education, and work experience." 20 C.F.R. § 416.920(b).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits [his] capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: (1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience. *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir.1983)). Moreover, the Commissioner must accord the assessment of a treating physician controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [it] is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.2003); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). The ALJ may not arbitrarily substitute his own judgment for the treating physician's competent medical opinion. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999).

The "treating physician rule" does not apply, however, when the treating phy-

sician's opinion is inconsistent with the other substantial evidence in the record, such as the opinions of other medical experts. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir.2002).

■ When the treating physician's opinion is not given controlling weight, the ALJ must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the SSA's attention that tend to support or contradict the opinion. (*Id.*). The ALJ must also set forth his reasons for the weight assigned to the treating physician's opinion. (*Id.*).

### B. *Application*

#### 1. *ALJ's March 16, 2001, Decision*

The ALJ found that plaintiff was not disabled from March 27, 1989, through the date of the hearing. (Tr. at 17). Thus, the ALJ held, she was not entitled to disability benefits pursuant to the reopening of her case under the *Stieberger* settlement. (*Id.*).

The ALJ applied the five-step sequential evaluation in deciding whether plaintiff was disabled. (*Id.*). In the first step, the ALJ found that plaintiff had not performed substantial gainful activity beginning March 27, 1989, through March 16, 2001. (*Id.* at 18).

In step two, the ALJ found that as of March 16, 2001, plaintiff had severe impairments of low back pain, a neck disorder, and cervical radiculopathy. (*Id.*). The ALJ explained that these impairments were "severe" within the meaning of the Act and Regulations because they imposed more than a slight limitation on plaintiff's functioning. (*Id.* (citing 20 C.F.R. § 404.1520(c))).

In step three, the ALJ found that plaintiff did not have clinical or laboratory findings that met or equaled in severity the clinical criteria of the impairments described in Appendix 1. (*Id.*). Consequently, the ALJ assessed plaintiff's RFC in step four to determine whether she could perform her prior work or other work existing in significant numbers in the national and regional economies. (*Id.*).

The ALJ considered the consultative orthopedic examination by Dr. Sarreal on August 3, 2000. (*Id.* at 18). The ALJ pointed out that plaintiff reported to Dr. Sarreal that she needed assistance with her shoes and socks, and that she got help from her sister in cooking, cleaning, and shopping, but that she did "light" household chores as much as possible. (*Id.*). An x-ray of plaintiff's lumbosacral spine revealed only "minimal" degenerative changes. (*Id.*). The ALJ also noted that plaintiff did not begin physical therapy until September 1999, well after her work-related injury in 1981 and well after her *Stieberger* development period began in March 1989. (*Id.*).

The ALJ evaluated all of the symptoms of plaintiff's complaints, including but not limited to pain, fatigue, shortness of breath, and weakness and/or nervousness. (*Id.* at 19). The ALJ also considered the nature, location, and intensity of the pain and other symptoms; any precipitating or aggravating factors; the effectiveness of medication and other treatment; and plaintiff's activities. (*Id.*). The ALJ found that although plaintiff reported suffering a slip-and-fall accident at work on February 9, 1981, there was no record of hospitalization or emergency room treatment for this injury. (*Id.*). Moreover, the ALJ noted that plaintiff testified that she had under-

gone an x-ray in 1981, which showed spasm, but she acknowledged that she did not undergo an MRI until September 1999 and had never undergone a CAT scan. (*Id.*).

The ALJ held that Dr. Memoli's clinical notes lacked objective clinical findings and accordingly, no weight was accorded to his reports. (*Id.*). Further, the ALJ held that the clinical findings of Dr. Sarreal were entitled to significant weight because the findings were well supported by medically acceptable clinical and laboratory diagnostic techniques. (*Id.*). Based on Dr. Sarreal's findings and objective clinical evidence in the record, the ALJ found that plaintiff did not satisfy the fourth step of the five-step procedure because plaintiff retained the RFC for sedentary work, which did not preclude her from performing her past relevant exertionally sedentary work as a record clerk or secretary.[2] (*Id.* at 21). Consequently, the ALJ determined that plaintiff was not disabled within the meaning of the Act. (*Id.* at 22).

## 2. *Weight Given to Treating Physician's Opinion*

■ I conclude that the ALJ erred in giving Dr. Memoli's opinion no weight and that the ALJ's decision to deny benefits was not supported by substantial evidence.

The ALJ chose to "accord no weight" to Dr. Memoli's opinion purportedly because Dr. Memoli's clinical notes lacked "objective clinical findings," and were "brief and conclusory and offer[ed] no insight into [plaintiff's] physical condition." (Tr. at 20). Dr. Memoli's findings, however, should have been given at least some weight. Although Dr. Memoli's workers'

compensation forms were brief, he also completed a medical assessment form in June 2000 with specific findings. (*Id.* at 216–18). In addition, Dr. Memoli noted "positive physical findings" several times in his notes on the workers' compensation forms. (*Id.* at 127, 129, 229, 231).

Moreover, there was at least some objective clinical evidence that corroborated Dr. Memoli's conclusion that plaintiff could only perform a narrow range of sedentary work. *See* Tr. at 216–18. The 1999 MRI of plaintiff's cervical spine revealed muscle spasm, mild degenerative disease, central disc bulge at C3–C4, C-4–C5, and C5–C6, and suspicion of an enlargement of the right lobe of the thyroid with a nodular density within it. (Tr. at 245). X-rays taken of plaintiff in 2000 revealed minimal degenerative changes in the lumbosacral spine and degenerative changes and CPPD Disease in the left knee. (*Id.* at 279).

In addition, it is not clear that Dr. Memoli's conclusions are inconsistent with the other substantial evidence in the record. For example, on the undated RFC assessment form, the medical consultant who completed the form indicated that there were no treating source conclusions about plaintiff's limitations or restrictions that were significantly different from the medical consultant's findings. (Tr. at 276).

The determination by the WCB in 1986 that plaintiff had a permanent partial disability is also some corroborating evidence that plaintiff did not have the residual functional capacity to perform sedentary work. (Tr. at 175). Dr. Colon stated that plaintiff had difficulty sitting, walking, standing, and lying down, marked limitation of motion of the neck, tenderness

---

2. "Sedentary work involves lifting no more than 10 pounds at a time an occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

along the cervical spine and upper back, and tenderness to palpation of the lumbar muscles and lumbar spine. (*Id.*). Although there is a distinction between a partial disability and a total disability, and an individual may still perform sedentary work while partially disabled, the findings by Dr. Colon of the WCB at least arguably corroborate Dr. Memoli's finding that plaintiff did not have the residual functional capacity to perform sedentary work. (*Id.*).

In deciding not to give the treating physician's opinion any weight, the ALJ failed to adequately consider the various "factors" to determine how much weight to give, such as the frequency and length of the treatment, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2). Dr. Memoli, an orthopedic physician, treated plaintiff every two months for 19 years. (Tr. at 43). Further, the corroborating evidence in the record set forth above lends support to the conclusion that Dr. Memoli's opinion should have been given some weight by the ALJ. Thus, the ALJ committed an error of law by not giving Dr. Memoli's opinion controlling weight, or at least some weight. *Green–Younger*, 335 F.3d at 106.

### 3. *Duty to Develop the Record*

█ Further, the ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999) (internal citations omitted). Although Dr. Memoli treated plaintiff for approximately 19 years (Tr. at 43), the record inexplicably contains no progress notes or other notes made by Dr. Memoli of his examinations. The ALJ simply concluded that "Dr. Memoli's clinical notes lack[ed] objective clinical findings," and that his notes were "brief and conclusory and offer[ed] no insight into the claimant's physical condi-

tion." Surely Dr. Memoli must have taken progress notes or other notes contemporaneously with his examination of plaintiff. There must have been records other than the brief workers' compensation forms.

█ The ALJ should have undertaken to obtain Dr. Memoli's additional notes because the ALJ concluded that the treating physician's opinion was not supported by objective evidence. The ALJ "did not have the luxury of terminating his inquiry with the findings that [the treating physician's] assertion of disability [was] 'totally conclusory' and inconsistent with the impairments from which [the plaintiff] admittedly suffer[ed]." *Morillo v. Apfel*, 150 F.Supp.2d 540, 546 (S.D.N.Y.2001). Instead, it was the ALJ's duty to seek additional information from plaintiff's treating physician *sua sponte*, "even if the clinical findings were inadequate." *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("[T]he ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel."); *see also Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998) ("If asked ... the doctor might have been able to offer clinical findings in support of his conclusion ... [and] failure to include this type of support for the findings ... does not mean that such support does not exist."). Likewise, the record did not contain any records relating to plaintiff's emergency room visit, the IME's, or the results from EMG and nerve conduction studies ordered by Dr. Memoli in 1981. (Tr. at 31–32, 45–46, 49). The ALJ should have undertaken to obtain these reports as well.

### 4. *Weight Given to Consulting Physician's Opinion*

█ Not only did the ALJ commit an error of law by giving no weight to the

treating physician, but he also gave undue weight to the consulting physician's opinion. Dr. Sarreal answered in plaintiff's interrogatories that he examined plaintiff for only 30 minutes and did not have plaintiff's past medical records. (*Id.* at 286, 290). Dr. Sarreal also responded "yes" to the question of whether he thought the treating physician was in a better position to assess plaintiff's condition and physical residual capacity. (*Id.* at 290). Further, although the ALJ was critical of the fact that plaintiff's MRI was conducted in 1999, he gave controlling weight to the consulting physician's findings, which were based in part on x-rays conducted even later, in 2000.

More significantly, although one of plaintiff's primary complaints was cervical pain, Dr. Sarreal conducted x-rays of the lumbosacral spine and left knee, and failed to have x-rays taken of the cervical spine. The treating physician, whose findings were given no weight by the ALJ, ordered an MRI of plaintiff's cervical spine in 1999. (Tr. at 245). Hence, it would appear that the ALJ applied a double standard. That is, the same criticisms that the ALJ made of the treating physician's findings could also be made of the consulting physician's findings, and yet the ALJ gave controlling weight to the consulting physician's conclusions.

Finally, Dr. Sarreal's specific conclusions were not significantly different from those of Dr. Memoli. Dr. Sarreal found that plaintiff was limited in lifting and carrying heavy objects, pushing and pulling; prolonged standing, and long distance ambulation. (*Id.* at 280). He reported weakness in the right hand grasp at 4/5 but with good bilateral hand dexterity and manipulation, including grasping, releasing, handling, and fingering objects. (*Id.*). The ALJ concluded that "[s]uch an assessment is compatible with sedentary work activity." (*Id.* at 20). Similarly, in *Rosa v.*

*Callahan,* the ALJ found that the consulting physicians' reports, which did not identify any serious impairments, were consistent with a finding that the plaintiff could perform sedentary work. 168 F.3d at 81 (2d Cir.1999). The Court held, however, that "[t]hose reports were consistent with this conclusion ... only to the extent that they were silent on the issue." *Id.* In addition, there was "no indication on the reports that the consultants intended anything by their silence or that they set out to 'express [an] opinion on [the] subject' of [the plaintiff's] sedentary work capacity." *Id.* (quoting *Carroll v. Secretary of Health and Human Servs.,* 705 F.2d 638, 643 (2d Cir.1983)). Hence, "the Commissioner was precluded from relying on the consultants' omissions as the primary evidence supporting its denial of benefits." *Id.*

Here, the ALJ applied the same reasoning as in *Rosa.* Based on the limitations that Dr. Sarreal described, the ALJ concluded that Dr. Sarreal's findings were consistent with the holding that plaintiff could perform sedentary work. (Tr. at 20, 280). Dr. Sarreal made no findings, however, on whether plaintiff retained the residual functional capacity to perform sedentary work. Thus, the ALJ should not have relied on Dr. Sarreal's "omissions" to lead to a finding that plaintiff was not disabled. Accordingly, the ALJ's holding that plaintiff had not been disabled at any time during the *Stieberger* development period and that she could perform sedentary work is based on legal error and is not supported by substantial evidence.

### CONCLUSION

The case is remanded to the Commissioner for further administrative proceedings consistent with this decision. For the reasons set forth above, plaintiff's motion for judgment on the pleadings is granted to the extent of the remand. The Com-

missioner's motion for judgment on the pleadings is denied. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.